**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL SUPERMARKET ASSOCIATION, R&E CORPORATION, AND THE REAL CHANCE, INC.,<br>*Plaintiffs,*<br><br>-against-<br><br>THE CITY OF NEW YORK and THE NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION,<br><br>*Defendants.* | Civil Action No.: ____________ |

**COMPLAINT FOR DECLARATORY AND PERMANENT INJUNCTIVE RELIEF UNDER SECTION 2 OF THE SHERMAN ACT AND SECTION 16 OF THE CLAYTON ACT**

Plaintiffs National Supermarket Association, a New York Not-for-Profit Corporation (“NSA”), R&E Corporation, (“R&E Corporation”), and The Real Chance, Inc., d/b/a City Fresh Supermarket (“City Fresh”), and (collectively, “Plaintiffs”), bring this action against the City of New York (the “City”) and the New York City Economic Development Corporation (“NYCEDC”; together with the City, “Defendants”) under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 16 of the Clayton Act, 15 U.S.C. § 26, and allege as follows:

## Nature of the Action

1. On July 27, 2026, Defendants announced "N.Y.C. Groceries: A Recipe for Affordability," a first-of-its-kind program under which the City will own full-service grocery stores (the "Stores"). The program is referred to herein as "N.Y.C. Groceries."
2. With one planned for each borough, the Stores are designed and planned to be "a model for future programs that move New York City past the cost-of-living crisis."
3. The Stores will be operated by private firms selected through a request for proposals ("RFP"). Attached and incorporated hereto at Exhibit 1 is the "N.Y.C. Groceries Program Operator(s)" document, which constitutes the RFP, and at Exhibit 2 is the "N.Y.C. Groceries: A Recipe for Affordability" document, which explains the vision for the N.Y.C. Groceries plan.
4. The RFP is currently open and set to close on October 16, 2026.
5. The stores will be branded under the "N.Y.C. Groceries" name, with the private operator managing day to day operations.
6. Locations for the first two Stores have been selected for East Harlem and Hunts Point in the Bronx. The Bronx store is targeted to open first, with a goal of no later than the end of 2027.
7. The Defendants' RFP invites private operators to bid for one or more locations (with a preference for a submission that not only covers all five locations but can provide potential properties for the Queens, Brooklyn, and Staten Island locations).
8. The key feature of the program—which is also the subject of this antitrust challenge—is the Defendants' requirement that the Stores offer "a core basket of everyday groceries" at a 30% discount from competing private retailers (the "Core Basket").

9. Under the N.Y.C. Groceries program, Defendants commit to financing the inevitable losses to the retailers operating the Stores from selling the Core Basket items at the mandated steep discount through public funds.
10. The Defendants propose to act in concert with the private operators to finance the 30% discount through a combination of factors including free rent (the facilities will operate on City property), exemption from property taxes, $70 million in City capital funds for construction and fit-out of the Stores, and, perhaps most importantly, ongoing taxpayer-funded “Affordability Payments” drawn from the City’s tax base paid to retailers to cover the losses sustained meeting the 30% discount target.
11. The program is unprecedented; the Defendants themselves have acknowledged that the “initiative will establish a first-of-its-kind model in major U.S. cities.”
12. There is almost no modern example of a municipal government entering the retail consumer-goods market, using its own properties to eliminate occupancy costs, immunizing the enterprise from taxes, and then undercutting nearby private businesses through a permanent discount pegged to their competitors’ prices.
13. A tax-supported discount designed to undercut competitors is precisely the type of predatory pricing scheme prohibited by the Nation’s antitrust laws.
14. Where traditional private-firm predation is constrained by the predator’s own balance sheet, the risk of insolvency, and the need to recoup losses through monopoly pricing (which might in turn attract yet more competition), none of those constraints applies to the Defendants’ scheme, because the City can operate the stores at a deficit indefinitely and no competitor would ever be able to compete.

15. Because the 30% discount is supported by tax revenues there is no need for the Defendants to engage in the traditional reward of recouping losses with monopoly prices.
16. From the Defendants' perspective, the elimination of competitors offering goods at market prices is the plan and its own reward.
17. Small bodegas and large grocery stores alike will feel the economic impact from the unfair competition inherent in this plan, but the grocers most at risk are independent full-service supermarkets.
18. These stores, frequently in the 8,000 to 12,000 square foot range in size, are where typical New Yorkers shop to "stock up for the week" on basic staples like produce, meat, dairy, and rice.
19. Full-service supermarkets like these stores typically draw customers from within a half-mile radius, or within an approximately 10-minute walk from the store.
20. N.Y.C. Groceries Stores selling the Core Basket at a 30% discount without regard for the substantial losses entailed by such retail pricing will compete with and severely undercut any other supermarkets or food retailers within a half-mile radius of the Stores.
21. However, the radius that will be served by the N.Y.C. Groceries Stores will actually be much larger, drawing in pedestrian customers from within as far away as a three-quarter mile radius.
22. Furthermore, both currently planned Stores are within easy reach of the subway lines, in particular the number 6 line. Given these Stores proximity to subway lines the customer draw will impact areas well beyond a simple walking distance radius from these stores.

23. Within the service radius ("Service Radius") of these N.Y.C. Groceries Stores no full-service supermarket can hope to compete against the Defendants' "Core Basket" 30% discount.

24. This tax subsidized predatory pricing scheme gives the Defendants' stores a massive and unfair advantage.

25. By bringing this action, Plaintiffs do not ask this Court to decide whether the City may operate stores or how best to run them.

26. This action seeks to apply to the Defendants' entry into the grocery industry the same terms and the same laws as apply to Plaintiff NSA's members, including the individual Plaintiffs' stores.

27. Count I alleges that Defendants have violated Section 2 of the Sherman Act as the RFP constitutes an attempt to monopolize the relevant grocery markets.

28. Count II seeks a declaration that, under the program currently under way, when the Defendants select a successful RFP proposal, this will consummate an agreement in violation of Section 2's prohibition against conspiracies to monopolize.

**Jurisdiction and Venue**

29. This is a civil antitrust action arising under Section 2 of the Sherman Act, 15 U.S.C. § 2, for declaratory relief and for permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The allegations in each Count are pled in the alternative and are to be interpreted in all instances to avoid any inconsistency.

30. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 26.

31. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c). The City of New York resides in this District. NYCEDC maintains its principal place of business in this District. A substantial part of the events giving rise to the claims occurred in this District, including the announcement of the program, the selections of the East Harlem and Bronx sites, and the issuance of the RFP.

32. This Court has personal jurisdiction over Defendants because they reside in, and transact business in, this District.

33. An actual, immediate, and justiciable controversy exists between Plaintiffs and Defendants concerning whether the N.Y.C. Groceries program, the RFP, and any acceptance of an RFP proposal violate Section 2 of the Sherman Act. Furthermore, the RFP response deadline of October 16, 2026, forces Plaintiffs to decide now whether to bid into a combination of probable illegality or to forgo participation while the program proceeds against them with the substantial risk if not probability that it will put them out of business.

## The Parties

### Plaintiffs

34. Plaintiff R&E Corporation opened at 809 Southern Boulevard, Bronx, New York, 10449, in 1984. It employs approximately 25 full-time employees and serves an average of approximately 700 customers per day. Over 60% of Plaintiff R&E Corporation's total sales volume is derived from items that fall within the categories comprising the City's defined Core Basket. R&E Corporation is located less than one-half mile from the announced Bronx site of N.Y.C. Groceries.

35. As the majority of R&E Corporation's customers are drawn from the same immediate area, the permanent 30% discount creates a serious risk to R&E Corporation's continued economic viability.

36. Plaintiff City Fresh has operated continuously at 125 E. 116th Street, New York, New York, 10029, for approximately 15 years. It employs approximately 50 full-time employees and serves an average of 3,000 customers per day. Over 60% of City Fresh's total sales volume is derived from Core Basket categories.

37. City Fresh is located less than one-fifth of a mile from the announced Harlem site. The majority of its customers are drawn from the same immediate area, so the permanent 30% discount creates a serious risk to City Fresh's continued economic viability.

38. Plaintiff NSA has over 150 members who, between them, manage over 400 stores throughout New York City (including members located inside the Service Radii of the announced Harlem and Bronx sites). NSA membership is largely comprised of independent grocers managing stores that average in size from 8,000 to 12,000 square feet, roughly the same size as the proposed N.Y.C. Groceries Stores. The core mission of the NSA is to advocate for its members with respect to business opportunities and government relations.

39. NSA members face a common dilemma: compete against the unfair advantages enjoyed by the N.Y.C. Groceries Stores or put in a bid to join the Defendants' likely unlawful program.

40. NSA has associational standing to pursue this action on behalf of its members. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). An association may sue as the representative of its members, even in the absence of injury to itself, when (1) its

members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

41. At least two NSA members, Plaintiff City Fresh and non-plaintiff Palero Food Corp. (located at 3550 White Plains Road, Bronx, New York, 10467) are ready, willing, and able to submit a proposal in response to the RFP upon a determination by this Court that the program is lawful. They currently operate multiple stores in the square footage range of the proposed N.Y.C. Groceries plan and have been operating New York City supermarkets for decades. However, both Plaintiff City Fresh and Palero Member are reluctant to submit RFP proposals due to its potential violation of antitrust law. Upon a determination by this Court that the N.Y.C. Groceries plan is lawful, both Plaintiff City Fresh and Palero Member are ready, willing, and able to undertake the steps necessary to submit a proposal in response to the RFP.

42. The interests NSA seeks to assert in this action go to its core mission to advocate for its members.

43. Lastly, as this action seeks declaratory and injunctive relief, there is no need for the participation of individual members in this lawsuit.

**Defendants**

44. Defendant City is a municipal corporation of the State of New York.

45. Through its Mayor, its agencies, and its capital budget, the City has designed, funded, and announced the N.Y.C. Groceries program, allocated $70 million in capital funds to

develop these locations, and directed NYCEDC to implement the program, including by issuing the RFP.

46. Defendant NYCEDC is a not-for-profit corporation that serves as the City's primary economic-development agency.

47. NYCEDC issued the RFP, selected or is selecting store sites, is procuring operators and branding, and will enter into the operating agreements that implement the 30% discount, free rent, tax exemption, and Affordability Payments. NYCEDC acts as the City's instrumentality and agent in the design and execution of N.Y.C. Groceries.

48. At all times relevant to this Complaint, Defendants have acted and will act jointly in designing, funding, soliciting participation in, and implementing the N.Y.C. Groceries program.

**Trade and Commerce**

49. The activities challenged in this lawsuit have occurred in, and have had and will have a substantial effect on, interstate commerce. The grocery products that will be sold at N.Y.C. Groceries Stores, and that are now sold by Plaintiffs, move in interstate commerce. The program will alter the terms of competition for the sale of those products in New York City.

## Factual Background

### A. The N.Y.C. Groceries Program

50. On April 14, 2026, Mayor Zohran Mamdani announced La Marqueta in East Harlem as the first site identified for the N.Y.C. Groceries' municipal grocery-store program. The

East Harlem store is planned as an approximately 9,000-square-foot, ground-up store with a targeted opening in 2029.

51. On or about May 18–19, 2026, the Mayor announced The Peninsula in Hunts Point, Bronx—the redevelopment of the former Spofford Juvenile Detention Facility—as the second site. The Bronx store is planned at approximately 15,000 square feet, to be integrated into a mixed-use campus that includes over 700 units of 100% affordable housing, and has a targeted opening by the end of 2027.

52. Defendants have stated that five initial Stores, one in each borough of the City, will open before the end of the Mayor's first term.

53. Defendants have committed $70 million in City capital funding for construction and fit-out of the stores.

54. Roughly $30 million alone is allocated to the ground-up La Marqueta store.

55. In May 2026, Defendants opened an online Sites Portal inviting private property owners to recommend locations in Brooklyn, Queens, and Staten Island. Eligible sites must include at least 10,000 square feet of retail space and be available on a timeline supporting opening by 2029.

56. On July 27, 2026, Mayor Mamdani, Deputy Mayor for Economic Justice Julie Su, and NYCEDC announced that a "core basket of everyday groceries will be 30 percent cheaper" at the five municipal stores. The basket includes all fresh produce, meat, and seafood, together with roughly twenty additional categories of pantry staples, dairy, and refrigerated goods. The discount is to apply to all shoppers regardless of income. Prices are to be locked in monthly rather than fluctuating week to week. Defendants project that

the discount will cut an average grocery bill by approximately 15%, or about $90 a month or $1,000 a year.

57. The same day, July 27, 2026, Defendants issued the RFP seeking private operators for one or more of the five stores, with responses due October 16, 2026.

**B. The Core Basket and the Mandatory 30% Discount**

58. The RFP states that the program is designed for the Stores to sell a "Core Basket" of everyday groceries -- produce, meat, seafood, and essential groceries – "at prices on average 30% below retail prices." Prices may be determined based on available market data, operator input, and other observable data points. NYCEDC and the selected operator will finalize the pricing methodology in the operative agreements. The discount is expressly measured relative to prevailing retail prices charged by private competitors.

59. The N.Y.C. Groceries mechanism is inherently predatory. A private competing firm is forced to finance a lawful price from its own sales, while the municipal Store finances losses from undercutting normally competitive prices from the City tax base. And because the Stores' price is defined and mandated as a 30% undercut of whatever private retailers charge, a private grocer cannot escape the disadvantage by lowering its own price.

60. Defendants have stated that the Stores will sell other products at regular market prices and that the Core Basket may represent on the order of 40% of store offerings. In actual practice, however, Core Basket items account for a much higher percentage of sales.

61. Core Basket items represent approximately 64% of all sales at a typical full-service supermarket.

62. For full-service stores at which customers "stock up for the week," Core Basket items are not a sideline. Produce, meat, seafood, dairy, bread, rice, beans, and similar staples are traffic-generating categories that bring customers into stores, once there those customers usually make purchases in other categories as well. However, once weekly stock-up purchases in Core Basket categories migrate to a municipal Store, along with those customers sales by existing retailers of items in other, non-Core Basket categories, will also be lost.

**C. City Financial Support and Cost-Shifting**

63. Under the announced model, the City will own the land, build and fit out the stores, cover occupancy costs, and waive or absorb property taxes. A private operator selected through the RFP will manage daily operations—merchandising, staffing, sourcing—subject to City-set pricing rules, labor standards, and brand identity. The operator is contractually required to sell Core Basket items to customers at the mandated discount off of competitors' prices.

64. Defendants will offset the losses created by the 30% discount through three taxpayer-funded supports: (a) free rent; (b) freedom from property taxes; and (c) ongoing "Affordability Payments" drawn from the City's tax base to cover remaining operating deficits driven by sale of Core Basket SKUs at discounted prices.

65. Covering rent and property taxes typically constitute an average of about 7% to 8% of every dollar spent at a supermarket.

66. Even with these costs shifted from consumers to New York City taxpayers, there will still be a need for taxpayer subsidies to cover the Defendants' "Affordability Payments."

67. This is a structural cost advantage that no private firm recovering all expenses - rent, taxes, wholesale costs, labor and operating expenses, and a normal return on capital - from sales can match.

68. Defendants themselves describe the stores as designed to "lower costs on everyday staples by using public ownership to eliminate costs that are currently passed on to consumers."

69. However, those costs are not eliminated: They are transferred to taxpayers.

70. The effective consumer price is achieved only by shifting real economic costs—rent, taxes, fit-out capital, and operating deficits—onto the tax base. These costs remain even if the City elects cover them for Stores from City taxes.

**D. Operator Selection, Branding, and Expansion**

71. The RFP states that the successful applicant "will have the opportunity to expand their existing business [through] the operation of one or more of the N.Y.C. Groceries locations." Defendants encourage submissions by parties able to manage all five locations and specifically encourage submissions by parties owning properties in Queens, Brooklyn, and Staten Island. Submissions may be made by teams. Respondents may propose additional privately owned sites through the Sites Portal. The RFP asks for "Wider Impact Narratives" identifying opportunities to expand the initiative's impact and anticipates complementary delivery models beyond physical stores.

72. The Defendants have stated their preference is to have applicants with strong experience running grocery stores in New York City, experience employing large numbers of workers, the ability to build strong connections with the communities they serve, experience with SNAP and WIC programs, and the ability to work in the Bronx.

73. While true of most NSA members, the two NSA members identified as interested in submitting proposals to the RFP—Plaintiff City Fresh and non-plaintiff Palero—are ideally situated to satisfy to these criteria.

74. Although privately operated, "[b]randing and space design will adhere to a distinctive new N.Y.C. Groceries identity created by NYCEDC, in collaboration with the City and a third-party branding consultant." Operators must agree to family-sustaining wages and benefits and a labor-peace agreement. The City sets the mission, standards, store design, and Core Basket pricing; the private operator supplies the labor and know-how. The combination is a public-private joint venture in the retail grocery market.

75. Defendants have made clear that the five stores are an initial step. The program is described as "a model for future programs" and as an effort to "reduc[e] prices in ways the private market alone cannot." Defendants have framed N.Y.C. Groceries as a first-of-its-kind model for major U.S. cities. Those statements supply the specific intent required by Section 2: Defendants intend that tax-financed municipal stores, not unsubsidized private grocers, will set the price of weekly groceries in the neighborhoods they enter, and that the model will be replicated. By operation of normal economics, the N.Y.C. Groceries Stores will displace existing competitors and drive them out of business.

**The Relevant Product and Geographic Markets**

**E. Product Market**

76. The relevant product market is the retail sale of general consumer groceries at full-service grocery stores—stores at which a household can "stock up for the week" by purchasing, in a single trip, the produce, meat, seafood, dairy, bread, and pantry staples that comprise

Defendants' Core Basket, together with the complementary grocery items that complete a weekly shop.

77. Within that market, stores whose average annual sales consist predominantly of Core Basket categories are particularly vulnerable. Those are the stores whose traffic and margin depend on the weekly stock-up basket that Defendants have targeted for a permanent 30% undercut. When more than a substantial share of a store's volume falls in the discounted categories, as is true of most competing full-service supermarkets at approximately 64% of sales, the store cannot cede the Core Basket and survive on residual categories. Customers who move their weekly stock-up trip to N.Y.C. Groceries take the rest of the basket with them.

78. Indeed, the mandated discount applies only to Core Basket items, and once competitors are driven from the market by the predatory pricing scheme, Store operators will be free to charge whatever they like for non-Core Basket items, and these are likely to be much higher monopoly prices.

**F. Geographic Market**

79. Given the population density of the Harlem and Hunts Point locations, the typical store's pertinent geographic market is measured by walking distance. Most consumers in these neighborhoods lack automobiles and the typical weekly shopper is a pedestrian. Public transportation only moderately expands the geographic pull of a traditional supermarket like the Plaintiff stores because of the practical difficulty of transporting a week's groceries by bus or subway.

80. The N.Y.C. Groceries plan 30% discount dramatically changes this calculus.

81. A service radius for the N.Y.C. Groceries store is expected to be at least the current half-mile radius of existing stores, but given the draw of artificially low prices it is  highly probably that the service radius of the Stores will be larger, on the order of a three-quarter mile radius ("Service Radius").

82. It is highly probable that additional consumers outside the direct Service Radius will utilize mass transit to take advantage of this discount, and thus be drawn away from existing retailers.

83. For the Bronx location at The Peninsula, a significant population lives within the Service Radius, and approximately two full service grocery stores—one of which is Plaintiff R&E Corporation—five smaller grocery and mini-markets, and twelve bodegas whose core weekly-stock-up business would be affected operate inside that radius.

84. For the Harlem location at La Marqueta, a significant population lives within the Service Radius, and approximately seven full-service grocery stores and twenty bodegas, delis, and small markets whose core weekly-stock-up business would be affected operate inside that radius. City Fresh Supermarket is one such store and is located less than one-fifth of a mile from the site.

85. The same analysis will apply to the Brooklyn, Queens, and Staten Island sites when they are designated. Plaintiffs reserve the right to amend to identify those markets as sites are selected.

86. No full-service grocery store inside the Service Radius whose average annual sales exceed 60% of items in the "Core Basket" of goods is expected to survive sustained competition with a N.Y.C. Groceries Store.

87. The combination of free occupancy costs and Affordability Payments backed by the City's taxing power creates a structural cost advantage that private operators—who must recover rent, taxes, and a normal return on capital from sales—cannot match.

**Predatory Pricing Backed by the Tax Base**

88. Predatory pricing—pricing below an appropriate measure of cost in order to destroy or discipline competitors—has long been held to violate the Sherman Act.

89. Under the N.Y.C. Groceries plan, New York City taxpayers will absorb $70 million in fit-out costs and the ongoing losses generated by a mandatory 30% discount. Access to the City's tax base is the ultimate vantage ground to further monopolize the trade in weekly groceries inside each Service Radius.

90. The RFP makes it clear that sales will be below cost—rent and taxes will be waived with the balance of the discount covered by tax subsidy. These costs do not disappear, they are simply shifted to New York City taxpayers.

91. Prices of Core Basket goods under the N.Y.C. Groceries program will be below any appropriate measure of actual costs.

92. As to non-Core Basket goods, once competition is eliminated there is a dangerous probability that Stores will attempt to recoup at least some costs by raising prices of non-Core Basket items to monopoly levels.

93. As to Core Basket pricing, the predators – Defendants alone and acting in concert with the Stores – need not recoup losses because losses are shifted onto the City tax base.

94. This cost shift to taxpayers is not part of a regulatory regime which this Court should defer to but rather is an act by the Defendants engaging as a market participant fully subject to—and in violation of—the Nation's antitrust laws.

**G. Below-Cost Pricing Measured by Total Cost**

95. The municipal Store price of Core Basket goods is achievable only by omitting real economic costs from the Store's books. The consumer pays 30% less than the prevailing retail price. The store does not earn that 30% from efficiency. It receives free rent, pays no property tax, is built with $70 million of public capital, and is backstopped by Affordability Payments. Those are costs of selling groceries that a private grocer must recover from the register but which the Defendants recover from taxpayers.

96. None of the usual premises or recoupment applies to N.Y.C. Groceries. Defendants face no risk of insolvency. They need not recoup. They need not earn monopoly profits from grocery sales; the tax base absorbs the deficit indefinitely. There is no short-run campaign that will end when capital runs out. There is no efficient private price cut being chilled; the advantage is not lower costs of buying, stocking, or selling groceries, but the ability to dump tax dollars into the register.

97. Given the long term structural advantage offered by the Defendants' access to the New York City tax base, average variable cost is the wrong basis from which to measure this predatory pricing scheme.

98. Instead, average total cost—which accounts the unfair long term advantages of free rent, forgiven property taxes, public capital carrying costs, and Affordability Payments—is the appropriate standard by which to measure when the Defendants' predatory prices.

99. Measured against average total cost, the Core Basket prices are below cost. The 30% discount is not a promotional sale funded by the operator's other SKUs. It is a contractual mandate, reset monthly against competitors' prices, and backfilled by the City. No

private full-service grocer inside the Service Radius can match that price and recover total cost.

**H. Recoupment Is Inapplicable to a Tax-Financed Predator**

100. Defendants need not, and under the announced design will not, recoup grocery losses from later monopoly grocery profits. They can operate at a deficit forever.

101. Insolvency is not possible and the scheme is not speculative: Defendants have selected sites, allocated $70 million, issued an RFP, and guaranteed a 30% undercut.

102. There is no efficient price cut that this Court could inadvertently chill as any "innovation" is simply access to the tax base.

103. Antitrust immunity for state and local governments is disfavored and only applies when they act pursuant to a clearly articulated state policy, enacted through its sovereign regulatory power, and clearly designed to displace competition.

104. No New York statute or constitutional provision authorizes the City to enter the retail grocery business and finance a permanent undercut of private grocers. The New York Constitution prohibits gifts or loans to private undertakings, N.Y. Const. art. VIII, § 1, and when the State authorizes municipal commercial activity—public housing, utilities, transit, recreation, industrial development—it does so expressly and with limits.

105. When government acts as a commercial participant in the retail grocery market with structural advantages unavailable to private firms—free rent, no property taxes, public capital, and Affordability Payments—the Sherman Act applies. The appropriate cost measure is total cost inclusive of those supports. Recoupment from later monopoly grocery profits is unnecessary to the scheme and is not a prerequisite to liability in this setting.

**Count I**
**Attempted Monopolization**
**Section 2 of the Sherman Act, 15 U.S.C. § 2**

106. Plaintiffs incorporate by reference the allegations of paragraphs 1 through 105 above as if fully set forth herein.

107. Section 2 of the Sherman Act makes it unlawful to "attempt to monopolize … any part of the trade or commerce among the several States." 15 U.S.C. § 2. Attempted monopolization requires (1) predatory or anticompetitive conduct, (2) specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

108. The RFP is an open, written solicitation to every private operator willing to join a combination that will sell the Core Basket items at a permanent, tax-financed 30% undercut of every nearby full-service grocer, with an express path to operate "one or more" of five locations and to serve as "a model for future programs."

109. The solicitation was issued on July 27, 2026, with a response deadline of October 16, 2026. Issuance of that solicitation, with the intent and market structure alleged above, is itself the attempted monopolization in violation of Section 2.

110. Attempted monopolization need not wait for a Store to open, for an operator to be selected, or for the first Affordability Payment to be made.

111. The predatory and anticompetitive conduct constituting the attempt includes, without limitation: (a) designing and announcing a mandatory 30% discount on Core Basket goods measured against competitors' retail prices; (b) financing that discount with free rent, forgiven property taxes, $70 million in public capital, and Affordability Payments, so that Core Basket prices are below average total cost; (c) issuing the RFP

inviting private firms to operate one or more of the five stores on those terms; (d) selecting sites inside dense, walking-radius markets already served by full-service grocers, including Plaintiffs R&E Corporation and City Fresh; (e) describing the five stores as a model for future programs that will reduce prices "in ways the private market alone cannot"; and (f) structuring the operator relationship so that acceptance of a proposal will lock in the undercut by contract.

112. Defendants have acted with the specific intent to monopolize the relevant product market—retail sales of weekly-stock-up groceries at full-service stores—inside each Service Radius. Specific intent is established by the predatory design itself and by Defendants' public statements that the private market "alone cannot" deliver the desired discounts, that the five stores are a "first step" and "a model for future programs," and that additional Affordability Payments will be required to pay for operating deficits driven by discounted Core Basket SKUs. This is not monopoly "by force of accident;" it is a planned displacement of unsubsidized weekly-stock-up grocers by a tax-financed alternative.

113. There is a dangerous probability that Defendants will achieve monopoly power in each relevant geographic market.

114. Dangerous probability turns on the proximity of the monopoly coming about and the degree of its impact. While the stores are set to open next year, the RFP—which constitutes its own separate offense of attempted monopolization—is open right now. As to the potential impact, with solvency guaranteed by the tax base, the Defendants' economic power is without equal and inside the Service Radius private full-service grocers cannot match a permanent 30% Core Basket undercut and recover total cost.

115. Defendants' attempt has injured and threatens to injure competition in the relevant markets and has injured and threatens to injure Plaintiffs in their business and property. Full-service grocers inside the Service Radii face extinction or absorption. Consumers will lose independent centers of grocery competition. Association members must decide whether to bid into the combination or watch it proceed against them. That injury is the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

116. Defendants' violations threaten continuing loss and damage to Plaintiffs unless permanently enjoined pursuant to 15 U.S.C. § 26.

**Count II**
**Declaratory Judgment**
**That Acceptance of an RFP Proposal Constitutes an Agreement**
**Forming the Foundation of a Section 2 Conspiracy to Monopolize**
**28 U.S.C. §§ 2201–2202; 15 U.S.C. § 2**

117. Plaintiffs incorporate by reference the allegations of paragraphs 1 through 116 above as if fully set forth herein.

118. Section 2 separately makes it unlawful to "combine or conspire with any other person or persons, to monopolize." 15 U.S.C. § 2. The elements of conspiracy to monopolize are (1) concerted action entered with (2) the specific intent to achieve an unlawful monopoly, and (3) an overt act in furtherance of the conspiracy.

119. Acceptance of a RFP by the City would constitute concerted action between the City and the successful bidder who submitted the particular RFP accepted.

120. The intent of the City and successful RFP bidder is to achieve an unlawful monopoly by means of unlawfully low prices that would serve to drive out competitors.

121. Conspiracy does not require a dangerous probability of success and can be established without ever having acquired the power to carry out the object of the conspiracy.

122. Concerted action deprives the marketplace of the independent centers of decision making that competition assumes and demands.

123. The Declaratory Judgment Act, 28 U.S.C. § 2201(a), authorizes this Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

124. An actual controversy exists. The RFP is outstanding. Responses are due October 16, 2026. Plaintiffs and Association members must decide whether to submit a proposal. If the program is lawful, a successful applicant gains a business partner with access to the City's tax base. If the program is unlawful, the City's acceptance of a proposal and execution of operating agreements may itself be participation in, or consummation of, a Section 2 conspiracy. That is a concrete and immediate dilemma, not an abstract disagreement.

125. Here, the RFP is the offer and any proposal selected by the Defendants would consummate the agreement.

126. At that moment, the Defendants and some private operator are certain to agree to sell Core Basket groceries at a tax-financed 30% undercut inside the Service Radius, with the specific intent to displace unsubsidized rivals and replicate the model.

127. NSA has specific members who are ready, willing, and able to submit a bid in response to the RFP but cannot do so without risking violating Section 2 of the Sherman Act.

128. Plaintiffs therefore seek a declaration that an accepted offer submitted in response to the RFP constitutes an agreement that violates Section 2 of the Sherman Act.

129. The declaration will settle the legal relations of the parties, finalize the controversy that now forces Plaintiffs to choose between bidding and abstaining, and will not encroach on any state-court proceeding.

130. Plaintiffs have no adequate remedy at law, and permanent injunctive relief under 15 U.S.C. § 26 is necessary to prevent threatened loss or damage from the conspiracy that acceptance would complete.

## Prayer for Relief

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

A. On Count I, a determination that Defendants have attempted to monopolize the relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, including by issuing the RFP;

B. On Count II, a declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202 that an accepted offer submitted in response to the RFP constitutes an agreement that violates Section 2's prohibition against conspiracies to monopolize. 15 U.S.C. § 2.

C. Permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from implementing the N.Y.C. Groceries program insofar as it employs a discount on Core Basket goods through free rent, property-tax exemption, or Affordability Payments to undercut full-service grocery competitors in the relevant markets; from accepting any RFP proposal or executing any

operating agreement that would consummate such a combination; and from otherwise attempting or conspiring to monopolize those markets;

D. An award of Plaintiffs' reasonable attorneys' fees and costs as authorized by 15 U.S.C. § 26 and other applicable law; and

E. Such other and further relief as the Court deems just and appropriate.

Dated: September 9, 2026

By: */S/ Richard P. Lawson*
Richard P. Lawson
AMERICA FIRST POLICY INSTITUTE
1455 Pennsylvania Ave., N.W., Suite 225
Washington, D.C. 20004
Telephone: 703-637-3690
rlawson@americafirstpolicy.com

- and –

By: */S/ Eric R. Levine*
Eric R. Levine
Eric P. Heichel
EISEMAN LEVINE LEHRHAUPT
& KAKOYIANNIS, P.C.
805 Third Avenue, 10th Floor
New York, New York 10022
212-752-1000
elevine@eisemanlevine.com
eheichel@eisemanlevine.com

*Attorneys for Plaintiffs*