**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL SUPERMARKET ASSOCIATION, R&E CORPORATION, AND THE REAL CHANCE, INC.,<br>*Plaintiffs,*<br><br>-against-<br><br>THE CITY OF NEW YORK and THE NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION,<br><br>*Defendants.* | Case No. 1:26-cv-07729 (JLR) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR AMENDED MOTION FOR A PRELIMINARY INJUNCTION**

AMERICA FIRST POLICY INSTITUTE
1455 Pennsylvania Ave., N.W., Suite 225
Washington, D.C. 20004
Telephone: 703-637-3690

- and -

EISEMAN LEVINE LEHRHAUPT
& KAKOYIANNIS, P.C.
805 Third Avenue, 10th Floor
New York, New York 10022
212-752-1000

*Attorneys for Plaintiffs*

Dated: September 22, 2026

# TABLE OF CONTENTS

**Page**


**INTRODUCTION**......1

**I. FACTUAL BACKGROUND**......3

A. The N.Y.C. Groceries Plan......3

1. Store Location Selection......3

2. Core Basket and Mandatory 30% Discount......3

3. City Financial Support and Cost-Shifting Mechanism......3

4. Operator Selection & Multi-Site Ambition......4

5. Branding and Operational Control......4

6. Future Expansion......4

B. The Plaintiff Stores and Trade Association......4

C. The Product and Geographic Markets and Competitor Viability......6

**II. REQUEST FOR PRELIMINARY INJUNCTION**......8

The Second Circuit Standard......8

A. Likelihood of Success on the Merits......10

1. Predatory and Anticompetitive Conduct......10

a. Sales Below Costs......11

b. Anti-Competitive Impact......13

c. Recoupment......13

i. Government as Market Participant......13

ii. Recoupment Inapplicable to Government Market Participants......18

2. Attempt to Monopolize......20

a. Specific Intent to Monopolize ....................20

b. Dangerous Probability of Achieving Monopoly Power ....................21

3. Conspiracy to Monopolize ....................22

4. Permanent Injunctive and Declaratory Relief Is Appropriate ....................23

B. Irreparable Harm ....................24

C. Balance of Equities and Public Interest ....................26

D. The Court Should Waive the Rule 65(c) Bond ....................26

**CONCLUSION** ....................27

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Able v. United States*,
44 F.3d 128 (2d Cir. 1995)....................9

*Admiral Insurance Co. v. Niagara Transformer Corp.*,
57 F.4th 85 (2d Cir. 2023)....................24

*American Tobacco Co. v. United States*,
328 U.S. 781 (1946)....................22

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993).................... 11, 13, 18, 19

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
479 U.S. 104 (1986)....................18, 24

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010)....................9

*City of Columbia v. Omni Outdoor Advertising, Inc.*,
499 U.S. 365 (1991)....................14, 15

*City of Lafayette v. Louisiana Power & Light Co.*,
435 U.S. 389 (1978)....................16

*Clark Pacific v. Krump Construction, Inc.*,
942 F. Supp. 1324 (D. Nev. 1996)....................25, 26

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984)....................22

*Cumulus Media New Holdings Inc. v. Nielsen Co. (U.S.), LLC*,
182 F.4th 108 (2d Cir. 2026)....................8, 9, 24, 26

*Do No Harm v. Pfizer Inc.*,
126 F.4th 109 (2d Cir. 2025)....................6

*Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*,
129 F.3d 240 (2d Cir. 1997)....................10, 22

*FTC v. Phoebe Putney Health System, Inc.*,
568 U.S. 216 (2013)....................14, 15

*FTC v. Ticor Title Insurance Co.*,
504 U.S. 621 (1992)....................15

*Glenwood Bridge, Inc. v. City of Minneapolis*,
940 F.2d 367 (8th Cir. 1991)....................24, 25

*Government Employees Insurance Co. v. Patel*,
No. 23-CV-2835 (KAM) (PK), 2024 WL 84139 (E.D.N.Y. Jan. 8, 2024)....................9

*Harmonia Holdings Group, LLC v. United States*,
166 Fed. Cl. 727 (2023)....................25

*Hartford Courant Co. v. Carroll*,
986 F.3d 211 (2d Cir. 2021)....................26

*Hunt v. Washington State Apple Advertising Commission*,
432 U.S. 333 (1977)....................5, 6

*Jefferson County Pharmaceutical Ass'n v. Abbott Laboratories*,
460 U.S. 150 (1983)....................16, 18

*Kay Electric Cooperative v. Newkirk*,
647 F.3d 1039 (10th Cir. 2011)....................15

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)....................18

*Mendez v. Banks*,
65 F.4th 56 (2d Cir. 2023)....................8

*New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015)....................25

*New York State Board of Elections v. Lopez Torres*,
552 U.S. 196 (2008)....................19

*Northeastern Telephone Co. v. American Telephone & Telegraph Co.*,
651 F.2d 76 (2d Cir. 1981).................... 12

*Northern Pacific Railway Co. v. United States*,
356 U.S. 1 (1958)....................2, 27

*Parker v. Brown*,
317 U.S. 341 (1943)....................................................................................14, 16, 17

*Pharmaceutical Society of the State of New York, Inc. v. New York State Department of Social Services*,
50 F.3d 1168 (2d Cir. 1995).......................................................................................26

*South-Central Timber Development, Inc. v. Wunnicke*,
467 U.S. 82 (1984)......................................................................................................14

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993).............................................................................................10, 21

*Standard Oil Co. of New Jersey v. United States*,
221 U.S. 1 (1911).................................................................................................17, 18

*Swift & Co. v. United States*,
196 U.S. 375 (1905).............................................................................................20, 21

*Town of Hallie v. City of Eau Claire*,
471 U.S. 34 (1985)...............................................................................................14, 15

*Union Pacific Railroad Co. v. United States*,
313 U.S. 450 (1941).............................................................................................17, 18

*United International Investigative Services, Inc. v. United States*,
41 Fed. Cl. 312 (1998) .................................................................................................25

*United States v. Aluminum Co. of America*,
148 F.2d 416 (2d Cir. 1945)...................................................................20, 21, 23, 24

*United States v. American Airlines, Inc.*,
743 F.2d 1114 (5th Cir. 1984) ......................................................................................23

*United States v. American Tobacco Co.*,
221 U.S. 106 (1911)......................................................................................10, 11, 20

*United States v. Topco Associates, Inc.*,
405 U.S. 596 (1972)........................................................................................................2

*United Technologies Communications Co. v. Washington County Board*,
624 F. Supp. 185 (D. Minn. 1985)...............................................................................25

*Volvo North America Corp. v. Men's International Professional Tennis Council*,
857 F.2d 55 (2d Cir. 1988)...................................................................................22, 23

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
549 U.S. 312 (2007)........................................................................................19

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008)..........................................................................................9

**STATUTES AND CONSTITUTIONAL PROVISIONS**

15 U.S.C. § 2..........................................................................................10, 22, 24

15 U.S.C. § 26..........................................................................................23

N.Y. Const. art. VIII, § 1 ..........................................................................................14

N.Y. Const. art. XVIII, § 10 ..........................................................................................15

N.Y. Gen. Mun. Law § 363 ..........................................................................................15

N.Y. Gen. Mun. Law § 862 ..........................................................................................15

N.Y. Mun. Home Rule Law § 10(7)..........................................................................................15

N.Y. Not-for-Profit Corp. Law § 1411 ..........................................................................................15

N.Y. Statute of Local Governments § 10(3)..........................................................................................15

**RULES**

Fed. R. Civ. P. 65(c) ..........................................................................................26

## INTRODUCTION[1]

On July 27, 2026, the City of New York ("City") and the New York City Economic Development Corporation ("NYCEDC"; City and NYCEDC together, "Defendants") announced their plan for City owned and taxpayer-subsidized grocery stores. (Lawson Dec. ¶ 3, Ex. A.; ¶ 8, Ex. F)[2] Entitled "N.Y.C. Groceries: A Recipe for Affordability," the initiative is a first-of-its-kind program under which Defendants will open publicly funded, privately operated full-service grocery stores. (Lawson Dec. ¶ 4, Ex. B; ¶ 7, Ex. E.) With one store planned for each Borough, Defendants have stated that the program is "a model for future programs that move New York City past the cost-of-living crisis and into a more just, inclusive economic future." *Id.* Store locations have been selected for Harlem and the Bronx; the Bronx location is targeted to open first (by the end of 2027) and the City has issued a request for proposals ("RFP") for private operators with a response deadline of October 16, 2026. *Id*.

The heart of the program is Defendants' plan that "a core basket of everyday groceries [will] be 30 percent cheaper at the five new municipal grocery stores." *Id.* The Defendants hope to meet this 30% discount by offering free rent, exempting the property from taxes, and granting private operators taxpayer-funded "Affordability Payments." *Id*. The City has allocated $70 million in capital funds for the five sites and contemplates ongoing Affordability Payments to cover operating deficits created by the mandatory discount. *Id*.

---

[1] This amended memorandum of law reflects changes made to the version filed on September 9, 2026 (ECF No. 14) in light of Defendants' representations that no private operator(s) for the N.Y.C. Groceries program will be selected prior to December 1, 2026. This preliminary injunction now seeks to prohibit the selection of the private operator(s) until after the Court's ruling on the merits.

[2] Filed with the original motion the Lawson Declaration can be found at ECF No. 9.

The N.Y.C. Groceries plan is unprecedented. There is almost no modern example of a government entering the retail consumer-goods market, using its own properties to eliminate rent, immunizing itself from taxes, and using tax dollars to undercut competitors' prices.

The taxpayer-subsidized discount poses an obvious risk of monopolization. The antitrust laws have been described as "a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade," *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958), and "the Magna Carta of free enterprise," *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972). A permanent, taxpayer-subsidized 30% discount measured against whatever private retailers charge is incompatible with those principles.

Plaintiffs do not ask this Court to decide whether the City may operate stores or how best to run them. This action seeks to clarify that if the Defendants want to compete in the grocery business they must do so fairly, as subject to the Nation's antitrust laws as are the Plaintiffs.

This preliminary injunction is sought as Plaintiffs face a concrete and immediate dilemma. If the program is lawful, the successful RFP applicant gains a business partner with access to the City's tax base. If unlawful, the very act of the City's acceptance of a proposal forms an agreement violating Section 2's prohibition against conspiracies to create a monopoly. Accordingly, Plaintiffs respectfully request this Court to enter a preliminary injunction prohibiting the award or denial of applications to become the private operator(s) of the N.Y.C. Groceries program until after a ruling on the merits of Counts I and II of the Complaint.

## I. FACTUAL BACKGROUND

### A. The N.Y.C. Groceries Plan

#### 1. Store Location Selection.

On April 14, 2026, Mayor Mamdani announced La Marqueta in East Harlem as the first site, with a targeted opening date of 2029. (Lawson Dec. ¶ 5, Ex. C.) On May 18, 2026, the Mayor announced The Peninsula in Hunts Point, Bronx, as the second site, to be integrated into a mixed-use campus that includes over 700 units of 100% affordable housing, with a 2027 target opening date. (Lawson Dec. ¶ 6, Ex. D.) Defendants have stated that all five sites will open before the end of Mayor Mamdani's first term. (Lawson Dec. ¶ 5, Ex. C.)

#### 2. Core Basket and Mandatory 30% Discount.

The RFP states that the program is designed to sell a "Core Basket" of everyday groceries (produce, meat, seafood, and essential groceries) "at prices on average 30% below retail prices." (Lawson Dec. ¶ 4, Ex. B.) Prices may be determined based on available market data, operator input, and other observable data points; NYCEDC and the Operator will finalize the pricing methodology in the operative agreements. *Id.*

#### 3. City Financial Support and Cost-Shifting Mechanism.

The Defendants have allocated $70 million in capital funds to build and fit out the stores; a private operator will manage daily operations. (Lawson Dec. ¶ 3, Ex. A.) The operator will offset deficits incurred by the 30% discount through free rent, free property taxes, and ongoing taxpayer-funded "Affordability Payments." (Lawson Dec.¶ 4, Ex. B.) Rent and property taxes typically constitute a material percentage of a full-service grocery store's operating expenses. Shifting those costs to New York City taxpayers and then supplementing the discount with direct Affordability Payments creates a structural cost advantage that no private firm can match.

**4. Operator Selection & Multi-Site Ambition.**

The successful applicant "will have the opportunity to expand their existing business [through] the operation of one or more of the N.Y.C. Groceries locations," and Defendants encourage submissions by parties able to manage all locations. (Lawson Dec.¶ 4, Ex. B.) Submissions by parties owning properties in Queens, Brooklyn, and Staten Island are specifically encouraged. *Id.* RFP submissions can also be made by teams. *Id.*

**5. Branding and Operational Control.**

Although privately operated, "[b]randing and space design will adhere to a distinctive new N.Y.C. Groceries identity created by NYCEDC, in collaboration with the City and a third-party branding consultant." (Lawson Dec.¶ 4, Ex. B.)

**6. Future Expansion.**

Defendants have made clear that the five stores are only an initial step. The program is described as "a model for future programs" and as an effort to "reduc[e] prices in ways the private market alone cannot." (Lawson Dec.¶ 4, Ex. B.) Defendants further anticipate complementary delivery models to expand access beyond physical store locations. *Id.*

**B. The Plaintiff Stores and Trade Association**

Plaintiff R&E Corporation opened its supermarket at its current Bronx location in 1984 (around the corner from the 41 Precinct, then known as "Fort Apache"). (R&E Corporation Dec. ¶ 5.)[3] It employs approximately 25 full-time employees and usually serves over 700 customers per day. (R&E Dec. ¶¶6, 7.) Over 60% of Grocery Store R&E Corporation's total sales fall within the Defendants' list of Core Basket items. (R&E Dec. ¶ 12.) R&E Corporation is located less than one-half mile from the announced Bronx site of N.Y.C. Groceries. As the majority of

[3] Filed with the original motion the R&E Declaration can be found at ECF No. 10.

R&E Corporation's customers are drawn from the same immediate area, the permanent 30% discount creates a serious risk to R&E Corporation's continued economic viability. (R&E Dec. ¶ 21.)

Plaintiff City Fresh has operated continuously at its current Harlem location for approximately 15 years. (City Fresh Dec. ¶ 5.)[4] It employs approximately 50 full-time employees and serves an average of 3,000 customers per day. (City Fresh Dec. ¶ 6, 7.) Over 60% of City Fresh's total sales fall within the Defendants' list of Core Basket items. (City Fresh Dec. ¶ 12.) City Fresh is located less than one-fifth of a mile from the announced Harlem site. The majority of its customers are drawn from the same immediate area, so the permanent 30% discount creates a serious risk to City Fresh's continued economic viability. (City Fresh Dec. ¶ 21.)

National Supermarket Association ("NSA") is comprised of over 400 stores managed by over 150 members throughout New York City, including members located inside the service radii of the announced Harlem and Bronx sites. (NSA Dec. ¶¶ 6, 12.)[5] The typical NSA store in New York City is owned by an independent grocer with stores averaging 9,500 square feet. (NSA Dec. ¶¶ 7, 8.) The core mission of NSA is to advocate for its members with respect to business opportunities and government relations. (NSA Dec. ¶ 5.) Its members face a common dilemma: try to compete against the unfair advantages enjoyed by the N.Y.C. Grocery stores, or put in a bid to join the Defendants' likely unlawful program. (NSA Dec. ¶ 13.)

NSA has associational standing to pursue this action on behalf of its members. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). An association may sue as the representative of its members, even in the absence of injury to itself, when (1) its members

---

[4] Filed with the original motion the City Fresh Declaration can be found at ECF No. 11.
[5] Filed with the original motion the NSA Declaration can be found at ECF No. 12.

would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Id.*; *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 118 (2d Cir. 2025).

Each *Hunt* element is satisfied. First, Plaintiff City Fresh as well as another supermarket, Palero Food Corp. ("Palero"), with a store located at 3550 White Plains Road, Bronx, New York, 10467, are both NSA members, and have their own standing. *See Do No Harm*, 126 F.4th at 118. Palero supermarket has been at that location and under the same management for 34 years. (NSA Dec. ¶¶ 14, 16). Palero and City Fresh have ideal experience to act as the private operator for the N.Y.C. Groceries plan. (NSA Dec. ¶ 19) Based on the Defendants' representation that the N.Y.C. Groceries program awards will not be decided prior to December 1, 2026, certain NSA members, including Palero, intend to submit RFP proposals before the October 16, 2026, deadline. The entry of a preliminary injunction will protect members who may wish to submit a response to the RFP while also protecting other NSA members from having to unfairly compete against an antitrust conspiracy.

**C. The Product and Geographic Markets and Competitor Viability**

As set out in the declaration of Avi Kaner, a 30-year veteran and expert on the New York City supermarket industry, the product market is general consumer groceries, specifically encompassing retail grocery stores where more than 64% of average annual sales consist of items that will be subject to the 30% discount for core goods offered at N.Y.C. Groceries. (Exp. Dec. ¶ 17.)[6]

---

[6] Filed with the original motion the Expert Declaration can be found at ECF No. 13.

Given the population density of the Harlem and Bronx locations, the pertinent geographic markets are measured by walking distance. (Exp. Dec. ¶ 20.) Public transport and ride sharing only moderately expand the geographic scope because the additional travel costs rapidly erode the savings from the 30% discount. (Exp. Dec. ¶ 21.)

Under usual conditions, with normally competitive pricing among neighboring grocery stores, the usual geographic area served by a neighborhood supermarket in the locations of the proposed N.Y.C. Groceries stores is approximately a one-half mile radius from the store. The proposed N.Y.C. Groceries stores, however, offering a sustained 30% discount on Core Basket products, is highly likely to materially change the distance consumers have an economic incentive to travel. As discussed in detail in the accompanying Kaner Dec., the relevant geographic reach of the N.Y.C. Groceries stores will likely approach three-quarters of a mile, encompassing consumers within approximately a 20-minute walk of each location (the "Service Radius"). (Exp. Dec. ¶ 22.)

For the Bronx location, there are a significant number of people living within this Service Radius and approximately two full-service grocery stores—one of which is Plaintiff R&E Corporation—five smaller grocery and mini-markets, and twelve bodegas whose core business would be affected by competition with the Bronx N.Y.C. Grocery. (Exp. Dec. ¶ 27.)

For the Harlem location, there are likewise a significant number of people living within the Service Radius and at least seven full-service supermarkets or larger grocery stores and at least twenty bodegas within the Service Radius whose core business would be affected. (Exp. Dec. ¶ 31.); City Fresh is one such store and is less than a five-minute walk from the announced N.Y.C. Groceries site. (Exp. Dec. ¶ 32.)

No store inside the Service Radius whose average annual sales comprise more than 60% Core Basket goods is expected to survive sustained competition with a N.Y.C. Grocery offering a permanent 30% discount on those goods. (Exp. Dec. ¶ 51.) Stores whose sales fall in a somewhat lower range of Core Basket goods will also be severely stressed as customers shift their core purchases and then bring their remaining shopping to the City store.

The combination of free occupancy costs and Affordability Payments backed by the City's taxing power creates a structural cost advantage that private operators—who must recover rent, taxes, and a normal return on capital from sales—cannot match. (Exp. Dec. ¶ 36.)

## II. REQUEST FOR PRELIMINARY INJUNCTION

To preserve the status quo—the currently open RFP process—the Plaintiffs respectfully move for a preliminary injunction prohibiting Defendants from awarding the N.Y.C. Groceries program until this Court's final ruling on the Complaint. As the Defendants have confirmed that no award will be made prior to December 1, 2026, a preliminary injunction on or before that date will prevent the formation of an unlawful conspiracy that is addressed in Count II..

### The Second Circuit Standard

To obtain a preliminary injunction Plaintiffs must show "(1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiffs' favor, (2) that they are likely to suffer irreparable injury in the absence of an injunction, (3) that the balance of hardships tips in their favor, and (4) that the public interest would not be disserved by the issuance of a preliminary injunction." *Cumulus Media New Holdings Inc. v. Nielsen Co. (U.S.), LLC*, 182 F.4th 108, 124 (2d Cir. 2026) (*quoting Mendez v. Banks*, 65 F.4th 56, 63–64 (2d Cir. 2023).

The two merits paths identified in *Cumulus* are not identical. The "serious questions" path permits relief where the court "cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). Because the moving party must also show that "the balance of hardships tips decidedly" in its favor, "its overall burden is no lighter than the one it bears under the 'likelihood of success' standard." *Id.* at 35; *see also Gov't Emps. Ins. Co. v. Patel*, No. 23-CV-2835 (KAM) (PK), 2024 WL 84139, at *8 (E.D.N.Y. Jan. 8, 2024). Upholding the continued validity of the serious questions doctrine after *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008), the Second Circuit held that the "value of this circuit's approach to assessing the merits of a claim at the preliminary injunction stage lies in its flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation." *Citigroup*, 598 F.3d at 35–38. The "serious questions" flexibility is particularly appropriate in this unprecedented effort by a municipality to use its tax base to compete against retail supermarkets.

While the Second Circuit requires the likelihood-of-success standard when a government, acting pursuant to a statutory or regulatory scheme, is challenged that exception does not control here. *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995). As set forth below, no New York statutory or constitutional provision authorizes the N.Y.C. Groceries plan. *See infra* Point A.1.c.i. The program is market participation, not sovereign regulation "pursuant to a statutory or regulatory scheme." *Able*, 44 F.3d at 131. Moreover, the preliminary injunction only seeks to prohibit an award of the N.Y.C. Groceries program pending a merits ruling, not cancel the program. Plaintiffs therefore proceed on both paths: they are likely to succeed on the merits of

their Section 2 claims and have also raised serious questions about the validity of the N.Y.C. Groceries plan.

**A. Likelihood of Success on the Merits**

Section 2 of the Sherman Act prohibits attempted monopolization and conspiracy to monopolize. 15 U.S.C. § 2 ("Every person who shall … attempt to monopolize, or combine or conspire with any other person or persons, to monopolize … shall be deemed guilty of a felony."). Count I alleges that the N.Y.C. Groceries plan is an attempted monopolization under Section 2. Attempted monopolization requires (1) predatory or anticompetitive conduct, (2) specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). Count II is a declaratory action asking this Court to determine if an antitrust conspiracy is formed once the City selects the RFP's successful applicant. Unlike attempt, conspiracy does not require proof of a dangerous probability of monopoly power; conspiracy claims must allege concerted action, overt acts in furtherance of the conspiracy, and specific intent to monopolize. *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997). The N.Y.C. Groceries program satisfies each element of attempt and conspiracy.

**1. Predatory and Anticompetitive Conduct**

Common to both the attempt and conspiracy claims is Defendants' predatory pricing plan. Predatory pricing—pricing below cost to destroy competitors—has long been held to violate the Sherman Act. In *United States v. Am. Tobacco Co.*, 221 U.S. 106, 160–61 (1911), the Supreme Court condemned a campaign of "ruinous competition" in which American Tobacco lowered the price of plug tobacco below cost, forcing competitors either to join the combination or exit the industry. *Id.* at 160. After a campaign lasting five years and costing American

Tobacco $4 million, this "warfare produced its natural result" as competitors either folded or came to terms. *Id.* at 160, 161. The Court held that the power of the combination was being used "as a vantage ground to further monopolize the trade … either by driving competitors out of the business or compelling them to become parties to a combination." *Id.* at 182.

The N.Y.C. Groceries plan places private grocers in the same "if you can't beat them, join them" position. Where American Tobacco used private capital to absorb $4 million in losses, New York City taxpayers will absorb the $70 million in fit-out costs and the ongoing losses generated by a mandatory 30% discount. Access to the City's tax base is the ultimate "vantage ground to further monopolize the trade" in groceries.

These features satisfy the requirements for predatory pricing under *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226 (1993): the plaintiff must prove that the prices are below an appropriate measure of the rival's costs and that there is a dangerous probability of recouping the investment in below-cost prices.

**a. Sales Below Costs**

*Brooke Group*'s first element is met because Defendants themselves describe the stores as designed to "lower costs on everyday staples by using public ownership to eliminate costs that are currently passed on to consumers." (Lawson Dec.¶ 5, Ex. C.) Those costs are not eliminated; they are transferred to taxpayers. The effective price to the consumer is achieved only by shifting real economic costs onto the tax base (such as rent, taxes, and operating deficits to maintain the 30% discount). Those costs remain economic costs even if the City elects not to book them against the store's own accounts.

In determining the appropriate measure of "cost," the Second Circuit has distinguished among variable costs (such as materials, fuel, labor, and maintenance), average variable costs,

fixed costs (such as overhead and management expenses), and average total costs (an average based on both variable costs and fixed costs). *Ne. Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 86–88 (2d Cir. 1981). The Second Circuit examined a claim of predatory pricing against a private actor in *Northeastern Telephone* and adopted an average-variable-cost standard. *Id.*

That analysis for private actors is not applicable here, where the predator faces no risk of insolvency.

The Second Circuit's adoption of average variable cost was prudential: it feared that inadvertently condemning "competition as an instance of predation" would "chill the very behavior the antitrust laws seek to promote." *Id.* at 88. Further, *Northeastern* assumed such campaigns involve "short-run costs of predation," "lost profits," and that "to make sense" a merchant had to "recoup his short-term losses in the future." *Id.* at 89. The Second Circuit held:

> Thus it is not enough that the predator survive his own predatory prices; he must be able to earn monopoly profits in the not-too-distant future. Such profits, of course, will invite new entry.

*Id.* As discussed more fully below, access to the tax base neutralizes the private competitors' concerns and interests in lost profits, short-term losses, surviving short-run campaigns, and the need to recoup with monopoly prices that draw new competitors. And as the Defendants' advantage lies in access to City taxes and properties there is no prudential concern about chilling competitive behavior by punishing efficient sellers.

Defendants' efforts are *sui generis*. While *Northeastern*'s average-variable-cost standard applies to private entities engaged in short-run predatory campaigns, average total cost—including rent and taxes as well as the direct payments to cover the 30% discount—is the appropriate standard when a competitor enters an industry backed by a municipality's tax base.

**b. Anti-Competitive Impact**

There can be no doubt about the competitive – or rather anti-competitive – effect of Defendants' N.Y.C. Groceries plan. As discussed at length and in detail in the accompanying Kaner Dec., the Core Basket of goods for which the N.Y.C. Groceries program mandates a 30% discount accounts for approximately 64% of a typical supermarket's total sales, and sales of non-basket items are often made during the typical shopping trip to obtain Core Basket items. A material number of shoppers within the Service Radius of each location can be expected to be sufficiently driven by a desire to realize the 30% savings on such a substantial part of their shopping lists that the existing stores, including Plaintiffs' stores, will simply not be able to compete. This inability is solely limited to the artificially low prices, prices far lower than any competitor subject to normal economic factors could ever charge or maintain. As a result, the N.Y.C. Groceries program will render at least some, if not all, competing supermarkets within the relevant Service Radius economically unviable and materially reduce private grocery competition in the affected neighborhoods. Further, any attempt by private supermarkets to match the extremely large 30% discounts on Core Basket items would be economically unsustainable and drive any supermarkets that tried it out of business.

**c. Recoupment**

*Brooke Group*'s second element—recoupment—presents a unique issue: a municipal retail entrant that has no need to recoup losses from later monopoly profits because losses are absorbed indefinitely by the tax base. Traditional antitrust concerns about rational private actors, the speculative nature of recoupment, and the risk of chilling legitimate price competition simply do not apply when the predator is funded by compulsory taxation.

**i. Government as Market Participant**

When evaluating the application of antitrust laws to the commercial activities of state and local governments it must first be determined if the activity stems from sovereign regulatory authority or from market participation. *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 102 (1984) (Rehnquist, J., dissenting, "antitrust laws apply to a State only when it is acting as a market participant … [w]hen the State acts as a market regulator, it is immune from antitrust scrutiny.").

Deference to state regulatory authority was first set out in *Parker v. Brown*, 317 U.S. 341 (1943). The *Parker* Court held that there was no reason to believe that the Sherman Act was designed "to restrain state action." *Id.* at 351. The Court later explained that "in light of our national commitment to federalism, the general language of the Sherman Act should not be interpreted to prohibit anticompetitive actions by the States in their governmental capacities as sovereign regulators." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 374 (1991). Municipalities enjoy this same exemption when they "act pursuant to a clearly articulated state policy." *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 47 (1985). This extension of immunity flows from the idea that a legislature may wish to exercise its sovereign regulatory authority through municipalities. *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 226 (2013).

As to the N.Y.C. Groceries plan, no statutory or constitutional provision authorizes this type of business. To the contrary, the New York State Constitution prohibits gifts or loans to "any individual, or private corporation or association, or private undertaking." N.Y. Const. art. VIII, § 1. And when commercial activity is authorized, New York knows how to cabin and police its parameters. For example, the New York Constitution authorizes public housing

operations but provides that nothing in that provision "shall be deemed to authorize or empower … any city … to engage in any private business or enterprise other than the building and operation of low rent dwelling." N.Y. Const. art. XVIII, § 10. Similarly, the New York Legislature has specifically authorized public utilities, N.Y. Gen. Mun. Law art. 14-A, § 363, transit, N.Y. Mun. Home Rule Law § 10(7), and recreational facilities, N.Y. Stat. Local Gov'ts Law § 10(3). Local Development Corporations are confined to activity related to industrial and manufacturing plants "for use by others" and may exercise their powers "not for any other purposes." N.Y. Not-for-Profit Corp. Law § 1411. Industrial Development Agencies are generally prohibited from providing financial assistance for projects in which retail sales facilities constitute more than one-third of project cost, with narrow, conditioned exceptions. N.Y. Gen. Mun. Law § 862. This overview shows that New York knows how to authorize and limit municipal commercial activity, and a review of New York law reveals nothing like the specific authorization expected by *Omni*, *Eau Claire*, and *Phoebe Putney*.

Furthermore, even if Defendants have statutory authority, the Court has recognized that authority to "play in a market" is not general authority for a municipality "to roughhouse in that market unlawfully." *Phoebe Putney*, 568 U.S. at 231 (*quoting Kay Elec. Coop. v. Newkirk*, 647 F.3d 1039, 1043 (10th Cir. 2011)).

The Court in *Phoebe Putney* held that "given the fundamental national values of free enterprise and economic competition that are embodied in the federal antitrust laws, 'state-action immunity is disfavored, much as are repeals by implication.'" *Phoebe Putney*, 568 U.S. at 225 (*quoting FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 636 (1992)).

While the Court has never specifically adopted a market-participant exception in Sherman Act cases—an issue that remains open (*see, e.g.*, *Omni*, 499 U.S. at 379)—the Court has held that market participant activities are subject to the Robinson-Patman Act.

In *Jefferson Cnty. Pharm. Ass'n v. Abbott Labs.*, 460 U.S. 150, 153–54 (1983), the Supreme Court held that the Robinson-Patman Act reaches state and local government hospitals that purchase drugs at preferential government-rate prices and then resell them in competition with private pharmacies. The Court framed the issue as one that did not involve "state purchases for use in traditional government functions … [but] purchases for the purpose of competing against private enterprise—with the advantage of discriminatory prices—in the retail market." *Id.* at 153–54. *Jefferson County*'s reference to "traditional government functions" is informative: many courts routinely uphold antitrust exemptions for activities such as waste processing, health care and hospitals, and airports. There appear to be no Sherman Act cases applying the market-participant exception against governments competing against retail consumer-goods businesses through tax-subsidized discounts.

Although a Robinson-Patman Act case, *Jefferson County* relied on *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389 (1978), a Sherman Act case, to reject a blanket antitrust immunity for state and local entities acting as market participants. In rejecting that sweeping claim of immunity, the *City of Lafayette* Court held that there was no reason to expect "economic choices made by public corporations in the conduct of their business affairs, designed as they are to assure maximum benefits for the community constituency," would be more likely to advance "the broader interests of national economic well-being than … private corporations." *Id.* at 403.

In addition to the Robinson-Patman Act analogy with *Jefferson County*, *Parker* itself recognized municipal liability as a market-participant. In upholding a legislative initiative

compelling coordinated marketing efforts for the California raisin industry, the Court specifically contrasted the program with a "municipality becoming a participant in a private agreement or combination by others for restraint of trade, *cf. Union Pac. R.R. Co. v. United States*." 317 U.S. at 351–52.

*Parker*'s reference to *Union Pac. R.R. Co. v. United States*, 313 U.S. 450 (1941), is particularly instructive. In *Union Pacific*, Kansas City, Kansas, entered into a public-private partnership with the Union Pacific whereby the City would "construct, operate and own" a market that would serve the Greater Kansas City area. *Id.* at 452. There was already a market in Kansas City, Missouri, and as Greater Kansas City was deemed too small to support two markets the railroad and Kansas City, Kansas, took "steps to persuade dealers on the Missouri side to move to Kansas." *Id.* Constructed on public lands, this "city-owned market would be tax free, and thus able to offer dealers the inducement of especially low rentals." *Id.* To lure Missouri businesses to their new market, Kansas City, Kansas, offered these merchants financial incentives including "free rents, reduced rents, free refrigeration, cash payments, and rental credits." *Id.* at 458. As these efforts were all made in tandem with the "Union Pacific's principal and compelling motive … to divert produce traffic from other railroads to its own," the Court held that these actions violated Elkins Act prohibitions against unlawful concessions and discriminations. *Id.* at 461–63. Rejecting the argument that these payments were valid as undertaken "in furtherance of its [Kansas City, Kansas'] municipal interests," the Court held that "the promotion of civic advancement may not be used as a cloak to screen the granting of discriminatory advantages to shippers." *Id.* at 465.

Although *Union Pacific* applied the Elkins Act rather than the Sherman Act, the rebates prohibited by the Elkins Act are foundational to antitrust law: Discriminatory pricing was central

to Rockefeller's growth of Standard Oil and the rebates he secured featured prominently in the Supreme Court's decision in *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 42 (1911).

The N.Y.C. Groceries program is a direct analogue to *Union Pacific* and *Jefferson County*. Tapping government resources like the free rent and taxes as in *Union Pacific* and government discounts on wholesale prices in *Jefferson County*, the City supplies tax-exempted premises, free rent, capital funding, and ongoing Affordability Payments to undercut private competitors on price. The Defendants are clearly acting as market participants, and are subject to the Nation's antitrust laws.

**ii. Recoupment Inapplicable to Government Market Participants**

The focus on recoupment in antitrust jurisprudence reflects the almost uniform and exclusive application of this theory to private, profit-seeking businesses that run very real risks of bankruptcy. In *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–89 (1986), the Court held that for a predatory pricing "investment to be rational, the conspirators must have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered." *See also Brooke Group*, 509 U.S. at 224 ("Recoupment is the ultimate object of an unlawful predatory pricing scheme …").

The emphasis on recoupment is further motivated by two prudential concerns. First, there is a concern that since lowering prices is the best way to stimulate competition, an erroneous finding of predatory pricing may "chill the very conduct the antitrust laws are designed to protect." *Brooke Group*, 509 U.S. at 226 (*quoting Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 122 n.17 (1986)). Second, there is a concern that "predatory pricing is by nature speculative" as the recoupment—if it occurs—will be at some future point. *Matsushita*, 475 U.S. at 588.

Not one of these principles—rational actors, recouping costs at monopoly prices, chilling effects on competition, and the scheme's speculative nature—applies to the N.Y.C. Groceries plan. As envisioned by the plan, the City stores could operate at a deficit indefinitely and never even attempt recoupment; the New York City taxpayer is its underwriter and ultimate benefactor. Insolvency is simply not a possibility, and while the operator may see profits from the non-Core Basket items, the City need never seek recoupment of the tax dollar investment.

Government actors like Defendants need not, and often do not, act in a rational manner, and they certainly need not act with a private actor's fear of insolvency. *See, e.g.*, *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 209 (2008) (Stevens, J., concurring) ("But as I recall my esteemed former colleague, Thurgood Marshall, remarking on numerous occasions: 'The Constitution does not prohibit legislatures from enacting stupid laws.'"). *Brooke Group*'s suggestion that unsuccessful predation could be a "boon to consumers" is also inapplicable. The N.Y.C. Groceries plan is not offering the type of ill-advised and unsustainable free lunch that consumers might enjoy in a failed price war. The Court has explained that without "a reasonable expectation [of recoupment], a rational firm would not willingly suffer definite short-run losses." *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 319 (2007). By contrast, Defendants' plan is an indefinite shift of long-run losses to the City's tax base.

Similarly inapplicable are the Court's prudential concerns about courts erroneously condemning legitimate competitive advantages as unfair pricing. Rather than offering innovative methods of competition (after all, the RFP requesting private assistance proves Defendants do not know how to run a grocery store), Defendants' plan is simply to dump tax dollars into the industry.

And, lastly, there is nothing speculative about Defendants' predatory pricing scheme. Defendants will secure these locations, fit them up, exempt them from rent and taxes, and guarantee 30% discounts. Nothing could be more predatory than undercutting every single competitor in the area by 30% without regard for losses. These new stores can do this only because of their access to the City tax base, and there are few things less speculative than taxes.

The Supreme Court has condemned the use of a $4 million reserve to cover multi-year losses in "warfare [that] produced its natural result" of crushed competitors. *Am. Tobacco Co.*, 221 U.S. at 160, 161. The N.Y.C. Groceries plan is no less certain to produce this "natural result" of crushed competitors, and with declarations that N.Y.C. Groceries "will offer a model for future programs" it is equally obvious that this is Defendants' intent. (Lawson Dec.¶ 4, Ex. B.)

**2. Attempt to Monopolize**

**a. Specific Intent to Monopolize**

Intent is an essential element of attempted monopolization. *Swift & Co. v. United States*, 196 U.S. 375, 396 (1905). Defendants' public statements supply it. They have described the five stores as only the "first step," declared that the private market "alone cannot" deliver the desired discounts, and announced the program as "a model for future programs." (Lawson Dec.¶ 4, Ex. B.) They have recognized that additional "Affordability Payments" will be required "to pay for operating deficits driven by the sale of Core Basket SKUs at discounted prices." *Id.* And the 30% discount is measured against competitors' retail prices, ensuring that the City stores will always undercut private rivals.

This emphasis on monopolistic intent is prudential in nature. It has been held that a monopoly must be more than just size, that "the growth must be something else than 'natural' or 'normal.'" *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 429 (2d Cir. 1945) ("*Alcoa*").

The antitrust laws were not designed to ensnare businesses that achieved monopoly power "without having intended either to put an end to existing competition, or to prevent competition arising when none had existed"; entities that "become monopolists by force of accident" are excluded from antitrust scrutiny. *Id.* at 429–30.

As with predatory pricing generally, these prudential concerns are inapplicable to the N.Y.C. Groceries plan. As an initial matter, Defendants' predatory tactics demonstrate their unlawful intent. *Spectrum Sports*, 506 U.S. at 459 ("… whether the defendant has engaged in 'unfair' or 'predatory' tactics … may be sufficient to prove the necessary intent to monopolize …"). However, the danger the focus on intent is designed to prevent—subjecting superior, and perfectly lawful, competitive advantages to antitrust scrutiny—does not apply when the competitive advantage lies in tapping the tax base. The inevitable closure of businesses unable to compete with the 30% tax-subsidized discount could not be further from the "monopolists by force of accident" addressed in *Alcoa*.

**b. Dangerous Probability of Achieving Monopoly Power**

"Dangerous probability" turns on proximity and degree. *Swift*, 196 U.S. at 402. Developing *Swift*'s "proximity and degree" standard in *Spectrum Sports*, the Supreme Court stated that "intent is necessary, but alone is not sufficient, to establish the dangerous probability of success that is the object of § 2's prohibition of attempts." 506 U.S. at 455. *Spectrum Sports* went on to hold that in addition to intent, attempted monopolization claims require "inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Id.* at 459.

With solvency guaranteed by the City's tax base, Defendants' economic power in the market is without equal. The only remaining question is whether private competitors can match a

permanent 30% discount pegged to their own prices. Inside the Service Radius—the relevant geographic market—they cannot. R&E Corporation and City Fresh are each located within one-half mile of the announced sites; numerous other competing small stores operate inside each radius and more than 60% of the Plaintiff Stores' sales—the relevant product market—are Core Basket goods subject to the discount. The discount mechanism itself ensures that any private price reduction simply widens the City's subsidy obligation. The proximity of harm is immediate: the RFP is open now and the Bronx store is scheduled to open as early as 2027.

**3. Conspiracy to Monopolize**

Section 2 separately makes it a crime to "combine or conspire with any other person or persons, to monopolize." 15 U.S.C. § 2. The elements of conspiracy to monopolize are (1) concerted action entered with (2) the specific intent to achieve an unlawful monopoly, and (3) an overt act in furtherance of the conspiracy. *Elecs. Commc'ns Corp.*, 129 F.3d at 246. Not only is there no need to establish a dangerous probability of success, Section 2 liability for conspiracy can be established "without ever having acquired the power to carry out the object of the conspiracy." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 789 (1946). Unlike a unilateral attempt, conspiracy is "inherently … fraught with anticompetitive risk" and "deprives the marketplace of the independent centers of decision making that competition assumes and demands." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767–69 (1984).

The RFP is an open invitation to private operators to join a combination offering a permanent, tax-financed 30% undercut of every nearby grocer, with an express path to operate "one or more" of the five locations and to serve as "a model for future programs." (Lawson Dec. ¶ 4, Ex. B.) That is concerted action with specific intent. Acceptance of a submission would consummate the combination. *See Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857

F.2d 55, 74 (2d Cir. 1988) (both completed and proposed anticompetitive practices "could qualify as overt acts").

*United States v. Am. Airlines, Inc.*, 743 F.2d 1114 (5th Cir. 1984), illustrates how readily an unlawful unilateral attempt (such as the RFP) can be converted to a consummated conspiracy (with acceptance of a "successful" bid). In *American Airlines* the government brought a Section 2 attempt claim based on a solicitation made by Robert Crandall, President of American Airlines, to Howard Putnam, President of Braniff Airlines, to raise fares twenty percent. *Id.* at 1116–19. Even though Putnam refused, the Fifth Circuit held that agreement is "not an absolute prerequisite" to attempted monopolization and that liability "may be established by proof of solicitation along with the requisite intent." *Id.* at 1115, 1121–22. While Crandall's liability was fixed at the time of offer, Putnam only narrowly escaped liability: "If Putnam had accepted Crandall's offer, the two airlines, at the moment of acceptance, would have acquired monopoly power. At that same moment, the offense of joint monopolization would have been complete." *Id.* at 1118. So here: Defendants' RFP has established their liability for attempted monopolization. Private operators considering an RFP are—for the moment—in Putnam's position. If selected, the conspiratorial agreement will be consummated.

**4. Permanent Injunctive and Declaratory Relief Is Appropriate**

Federal law expressly authorizes injunctive relief against threatened loss or damage from antitrust violations. 15 U.S.C. § 26 ("Any person, firm, corporation or association shall be entitled to sue for and have injunctive relief … against threatened loss or damage by a violation of the antitrust laws …"). Antitrust law has long recognized that attempts to monopolize are "dangerous and the law will nip them in the bud" without waiting for monopoly to be achieved.

*Alcoa*, 148 F.2d at 431. Plaintiffs have alleged the type of injury the antitrust laws were designed to prevent. *Cargill*, 479 U.S. at 111.

While this Court has discretion to entertain declaratory actions, Plaintiffs respectfully submit that this case meets the Second Circuit's criteria for when district courts should accept jurisdiction. In *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 99–100 (2d Cir. 2023), the Second Circuit set out standards for when a court should exercise discretion to entertain a declaratory action, specifically, whether it: (1) clarifies or settles the legal issues involved; (2) finalizes the controversy and removes uncertainty; (3) is little more than litigation gamesmanship used merely for procedural fencing or establishing res judicata; (4) increases friction between sovereign legal systems or improperly encroaches on the domain of a state or foreign court; (5) there is a better or more effective remedy; and (6) concerns for judicial efficiency favor declining the matter. These factors are non-exhaustive and courts retain "wide latitude to address other factors as relevant to the ultimate question" of balancing accepting jurisdiction or yielding to other "considerations of practicality and wise judicial administration." *Id.* at 100. As Section 2 prohibits conspiracies as well as attempts to monopolize, 15 U.S.C. § 2, declaratory relief is appropriate in this matter.

**B. Irreparable Harm**

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Cumulus*, 182 F.4th at 135. Plaintiffs must show a continuing harm that cannot be adequately redressed by final relief and for which money damages cannot provide adequate compensation. *Id.* Money damages for lost profits do not fully compensate a bidder "denied its right to bid on a legal contract." *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371–72 (8th Cir. 1991). Although the Defendants have confirmed that no award will

be made prior to December 1, 2026, an injunction prohibiting selection until a final merits ruling will ensure that the award or denial of applications only takes place after a determination of the program's validity.

The Eighth Circuit confronted a similar issue in *Glenwood Bridge* where it examined a claim that a city had engaged in a bidding process that allegedly violated federal labor laws. *Id.* The court held that a preliminary injunction was appropriate as it "both protects … [the plaintiff's] interest in participating in a legal bidding process and ensures that the contract awarded will be a legal one." *Id.* at 372. Noting that it "makes little sense … not [to] consider this fact in the irreparable harm calculus," the court held that the City's interest in completing the bridge project expeditiously was outweighed by the plaintiff's interest in submitting a bid and "the public interest in ensuring a lawful bidding process." *Id.*; *see also United Techs. Commc'ns Co. v. Wash. Cnty. Bd.*, 624 F. Supp. 185, 188 (D. Minn. 1985) ("The loss of the chance to participate in a fair bidding process raises a significant threat of irreparable injury," and "[t]he only true remedy for such injury is to issue the injunction."); *Harmonia Holdings Grp., LLC v. United States*, 166 Fed. Cl. 727, 741 (2023); *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998) ("…[losing] the opportunity to compete for a contract and secure any resulting profits has been recognized to constitute significant harm.").

Moreover, when the government itself is the alleged source of the impropriety, the likelihood of irreparable harm is stronger, not weaker. Courts "do not consider the harm a party suffers from being prevented from violating the law." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 661 n.38 (2d Cir. 2015); *see also Clark Pac. v. Krump Constr., Inc.*, 942 F. Supp. 1324, 1349 (D. Nev. 1996) ("… the harm[s] to be avoided by the grant of equitable relief

would be irreparable …" including, *inter alia*, the plaintiff's "and the public interest in a lawful bidding process and the execution of a lawful public works contract.").

**C. Balance of Equities and Public Interest**

When the government is the opposing party, the balance-of-equities and public-interest factors merge. *Hartford Courant Co. v. Carroll*, 986 F.3d 211, 224 (2d Cir. 2021). Furthermore, *Cumulus* holds that the public interest is served by the preliminary enforcement of the antitrust laws. 182 F.4th 108. Defendants have no less of an interest than Plaintiffs in determining the validity of this program. A short delay in awarding the program imposes minimal harm on the City (the Bronx store is not scheduled to open until late 2027) while preventing the consummation of an antitrust conspiracy.

**D. The Court Should Waive the Rule 65(c) Bond**

Rule 65(c) provides that no preliminary injunction shall issue "except upon the giving of security by the applicant, in such sum as the court deems proper." Fed. R. Civ. P. 65(c). Although the text is mandatory, the Second Circuit recognizes an exception for cases enforcing public interests arising out of comprehensive federal statutes. *Pharm. Soc'y of the State of N.Y., Inc. v. N.Y. State Dep't of Soc. Servs.*, 50 F.3d 1168, 1174–75 (2d Cir. 1995). The "central consideration" is "the nature of the rights being enforced, rather than the nature of the entity enforcing them." *Id.* at 1175. A trade association acting in part from pecuniary interest may still obtain a waiver when it is enforcing federal rights of a public character. *Id.* at 1174–75.

*Pharmaceutical Society* also teaches what not to do. The district court there correctly waived the bond but erroneously required the plaintiff to waive the injunction-bond rule, exposing it to a claimed $25 million damages action. 50 F.3d at 1174–75.

This Court should waive security and should not require Plaintiffs to surrender the protection of the injunction-bond rule. Plaintiffs are asserting the Sherman Act's "comprehensive charter of economic liberty," *Northern Pac. Ry.*, 356 U.S. at 4, not seeking a private grab for a contract.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue a preliminary injunction prohibiting the award or denial of applications to become the private operator(s) of the N.Y.C. Groceries program until after a ruling on the merits of Counts I and II of the Complaint, waive the Rule 65(c) bond, and grant such other and further relief as may be necessary to preserve the status quo pending that ruling.

Dated: September 22, 2026

By: *<u>/s/ Richard P. Lawson</u>*
Richard P. Lawson
AMERICA FIRST POLICY INSTITUTE
1455 Pennsylvania Ave., N.W., Suite 225
Washington, D.C. 20004
Telephone: 703-637-3690
rlawson@americafirstpolicy.com

\- and -

By: *<u>/s/ Eric R. Levine</u>*
Eric R. Levine
Eric P. Heichel
EISEMAN LEVINE LEHRHAUPT
& KAKOYIANNIS, P.C.
805 Third Avenue, 10th Floor
New York, New York 10022
Telephone: 212-752-1000
elevine@eisemanlevine.com
eheichel@eisemanlevine.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), I hereby certify that this memorandum of law complies with the applicable word-count limitation. The memorandum contains 8,024 words, excluding the caption, table of contents, table of authorities, signature block, and this certificate.

*/s/ Richard P. Lawson*
Richard P. Lawson