No. 26 Civ. 7729 (JLR)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL SUPERMARKET ASSOCIATION, et al.,

Plaintiffs,

-against-

CITY OF NEW YORK, et al.,

Defendants.

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

***STEVEN BANKS***
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y. 10007*
*Tel: (212) 356-2364*

*Of Counsel: Daniel Crandall*
*Richard Schulsohn*
*Amanda Papandrea*
*Elisa Lee*
*Blake Ahlberg*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ... iii

PRELIMINARY STATEMENT ... 1

STATEMENT OF FACTS ... 4

ARGUMENT ... 8

LEGAL STANDARD ... 8

POINT I

PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS, NOR DO THEY ESTABLISH FAIR GROUND FOR LITIGATION ... 10

A. Plaintiffs Fail to Establish or Even Allege Potential Recoupment or Harm to Consumers ... 11

B. N.Y.C. Groceries Is Intended to Improve Affordability, Not Form a Monopoly ... 14

C. Plaintiffs Fail to Establish That Defendants Have a Dangerous Probability of Achieving Monopoly Power ... 16

POINT II

PLAINTIFFS FAIL TO ESTABLISH IRREPARABLE HARM ABSENT AN INJUNCTION ... 20

A. The Local Government Antitrust Act Immunizes Plaintiffs and Other Potential N.Y.C. Groceries Operators from Any Antitrust Damages Liability Resulting from Complying with the Instructions in the RFP ... 21

B. Plaintiffs' Alleged Irreparable Harm Is Too Speculative to Support an Injunction ... 23

POINT III

THE PUBLIC INTEREST AND BALANCE OF HARDSHIPS WARRANT DENYING AN INJUNCTION ....................26

CONCLUSION .................... 28

# TABLE OF AUTHORITIES

**Cases** **Pages**


*AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*,
181 F.3d 216 (2d Cir. 1999)....12 n.2, 16, 17, 18

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)....11

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
813 F. Supp. 2d 569 (S.D.N.Y. 2011)....17

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*,
142 F. Supp. 2d 296 (E.D.N.Y. 2001)....19

*Brooke Grp. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)....10, 11, 12

*Cacchillo v. Insmed, Inc.*,
638 F.3d 401 (2d Cir. 2011)....24

*Chapman v. N.Y. State Div. for Youth*,
546 F.3d 230 (2d Cir. 2008)....17

*City of N.Y. v. Grp. Health Inc.*,
649 F.3d 151 (2d Cir. 2011)....16

*City of Newburgh v. Richardson*,
435 F. Supp. 1049 (S.D.N.Y. 1977)....27

*Concord Assocs., L.P. v. Entertainment Props. Trust*,
817 F.3d 46 (2d Cir. 2016)....17, 19

*Conn. State Police Union v. Rovella*,
36 F.4th 54 (2d Cir. 2022)....9

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*,
96 F.4th 351 (2d Cir. 2024)....20, 24

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)....18

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016)....13

*Glenwood Bridge v. City of Minneapolis*,
940 F.2d 367 (8th Cir. 1991)....25, 26 n.3

*Glidedowan, LLC v. N.Y. State Dep't of Health*,
768 F. Supp. 3d 503 (W.D.N.Y. 2025)....................28

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007)....................20

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Medical Sys., Inc.*,
879 F.2d 1005 (2d Cir. 1989)....................17

*Kamerling v. Massanari*,
295 F.3d 206 (2d Cir. 2002)....................20, 24

*Kirtsaeng v. John Wiley & Sons, Inc.*,
568 U.S. 519 (2013)....................14

*L&M Bus Corp. v. Bd. of Educ. of the City Sch. Dist. of N.Y.*,
No. 18-CV-1902 (NGG) (SMG), 2018 U.S. Dist. LEXIS 58352 (E.D.N.Y.
Apr. 5, 2018)....................25, 26 n.3

*L&M Bus Corp. v. Bd. of Educ. of the City Sch. Dist. of N.Y.*,
No. 18-CV-1902 (NGG) (SMG),
2018 U.S. Dist. LEXIS 88354 (E.D.N.Y. May 25, 2018)....................24, 25, 26

*Levitch v. CBS*,
495 F. Supp. 649 (S.D.N.Y 1980)....................17

*Ne. Tel. Co. v. Am. Tel. & Tel. Co.*,
651 F.2d 76 (2d Cir. 1981)....................12, 15, 18

*New Phone Co. v. N.Y. City Dep't of Info. Tech. & Telecomms.*,
No. 03 CV 3978 (JG) (KAM),
2006 U.S. Dist. LEXIS 100976 (E.D.N.Y. Aug. 25, 2006) (Matsumoto, Mag.
J.),
*adopted by* 2006 U.S. Dist. LEXIS 100978 (E.D.N.Y. Oct. 12, 2006),
*aff'd*, 355 Fed. Appx. 503, 506 (2d Cir. 2009)....................22

*Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.*,
614 F.2d 832 (2d Cir. 1980)....................17

*Outbound Marine Corp. v. Pezetel*,
461 F. Supp. 384 (D. Del. 1978)....................13, 14

*Pac. Bell Tel. Co. v. linkLine Communs., Inc.*,
555 U.S. 438 (2009)....................11

*PepsiCo, Inc. v. Coca-Cola Co.*,
315 F.3d 101 (2d Cir. 2002)....................19

*Plaza Health Labs., Inc. v. Perales*,
878 F.2d 577 (2d Cir. 1989)....9

*Sample, Inc. v. Pendleton Woolen Mills, Inc.*,
704 F. Supp. 498 (S.D.N.Y. 1989) ....10

*Sandcrest Outpatient Servs., P.A. v. Cumberland Cnty. Hosp. Sys., Inc.*,
853 F.2d 1139 (4th Cir. 1988) ....21, 22, 23

*Smith & Johnson, Inc. v. Hedaya Home Fashions, Inc.*,
No. 96 Civ. 5821 (MBM), 1996 U.S. Dist. LEXIS 19023 (S.D.N.Y. Dec. 24, 1996) ....12

*Spectrum Sports v. McQuillan*,
506 U.S. 447 (1993)....10, 16

*Synergetics USA, Inc. v. Alcon Labs., Inc.*,
No. 08 CIV. 3669 (DLC), 2009 U.S. Dist. LEXIS 47466 (S.D.N.Y. June 4, 2009) ....13

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
142 F.3d 90 (2d Cir. 1998).... 14-15

*U.S. Steel Corp. v. Fortner Enters., Inc.*,
429 U.S. 610 (1977)....18

*U.S. v. ALCOA*,
148 F.2d 416 (2d Cir. 1945)....17

*U.S. v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956)....19

*United Int'l Investigative Servs. Inc. v. U.S.*,
41 Fed. Cl. 312 (1998) ....25

*United Techs. Comm'ns Co. v. Wash. Cnty. Bd.*,
624 F. Supp. 185 (D. Minn. 1985)....25

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
257 F.3d 256 (2d Cir. 2001)....11, 13, 14

**Statutes**

15 U.S.C. §§ 34, 36....21

N.Y. City Charter § 20-i ....9

N.Y. Mun. Home Rule Law § 10(1)(ii)(a)(12) ....9

**Other Authorities**

N.Y. Const. art. IX, § 2(c)(10) ........................................................................................... 9

S. Rep. No. 593, 98th Cong., 2d Sess. 2 (1984) ............................................................... 21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL SUPERMARKET ASSOCIATION, et al.,

Plaintiffs,

-against-

CITY OF NEW YORK, et al.,

Defendants.

26 Civ. 7729 (JLR)

## PRELIMINARY STATEMENT

There is no dispute that the N.Y.C. Groceries program will make groceries more affordable for consumers, particularly New Yorkers struggling to put food on the table. Hunger is a serious and growing public health problem—in 2025, roughly 30% of the City's adults were food-insecure. Food insecurity is associated with increased risk of health issues including diabetes, hypertension, stroke, heart disease, and cancer.

The City has long addressed hunger through a network of more than 700 food pantries and community kitchens, as well as several other programs that provide New Yorkers in need with access to free or discounted food. However, since the pandemic, there has been considerable inflation, with rising grocery prices exceeding income growth. Additionally, the 2025-26 federal budget reconciliation bill known as the "One Big Beautiful Bill Act" ("H.R.1") made major cuts to the federal Supplemental Nutrition Assistance Program ("SNAP"), which are still being implemented, and are making it even harder for food-insecure New Yorkers to afford groceries. These pressures are straining the City's existing hunger initiatives. Some pantries have been running out of food, and the City's other programs also only go so far to address the current crisis. N.Y.C. Groceries is an additional step that the City urgently needs to meet the moment—hunger does not wait for litigation to end.

Through the N.Y.C. Groceries program, the City aims to open five municipal grocery stores by 2029, one in each borough (the "Stores"), which are meant to complement the roughly 1,000 grocery stores that already exist across the city, not replace them. To make this program a reality, the City has engaged Defendant New York City Economic Development Corporation ("NYCEDC"), a not-for-profit corporation that serves as the City's primary economic development arm. The City and NYCEDC intend N.Y.C. Groceries to respond to the City's affordability crisis, and the concomitant problems of hunger and food insecurity, by making healthy groceries more accessible and affordable. While N.Y.C. Groceries is a City-led program, NYCEDC intends to select, through a request for proposals ("RFP"), private operators to manage the Stores. At the City's direction and in furtherance of the City's policy goals, NYCEDC's RFP requires operators to offer "Core Basket" items at an average of 30% below typical market price, and to sell other items at typical retail prices.

Plaintiffs assert claims for attempted monopolization and conspiracy to monopolize under the Sherman Act based on a predatory pricing theory, but allege no harm to consumers; they only allege that N.Y.C. Groceries will harm their interests as the owners of competing grocery stores. It is well-established that the purpose of antitrust law is to protect consumers, not competitors. Plaintiffs' claims fail because, *inter alia*, the City and NYCEDC seek to lower prices only for the benefit of food-insecure New Yorkers and other consumers, not to use the program to eliminate competition and later raise prices. Additionally, Plaintiffs cannot even articulate a plausible theory of how the five N.Y.C. Groceries program Stores will obtain monopoly power. Regardless, Plaintiffs ask the Court to issue a preliminary injunction against the N.Y.C. Groceries program, despite decades of antitrust precedent premised on the consumer welfare principle evincing that there is no violation of federal antitrust law.

Notwithstanding that N.Y.C. Groceries will benefit consumers, and that it therefore does not violate antitrust law as construed by existing precedent, Plaintiffs ask this Court to rule, contrary to precedent, that government-backed retailers that promote consumer welfare still violate antitrust law if they threaten to displace private competitors. Plaintiffs argue that the N.Y.C. Groceries program warrants a change in settled law because its Stores will receive subsidies in exchange for providing benefits to the public, purportedly unlike any other market competitors. This argument is both factually and legally unsupported. While N.Y.C. Groceries is in some respects a unique initiative, there is nothing new about government subsidies and tax breaks for retailers. In fact, alongside the aforementioned programs addressing hunger and food accessibility, the City and NYCEDC already provide and administer tax and zoning incentives to grocery stores in high-need areas through the Food Retail Expansion to Support Health ("FRESH") program. And courts do not treat government subsidies as an inherently illegitimate competitive advantage, generally applying the same antitrust laws to government-subsidized retailers as to any other market competitors. FRESH, food pantries, and other City programs that help New Yorkers access food do not violate antitrust law, regardless of whether they displace private retailers—N.Y.C. Groceries no more violates antitrust law than these programs.

Even if Plaintiffs' claims had merit, which they do not, Plaintiffs' preliminary injunction motion would still be deficient because it fails to establish likely imminent irreparable harm absent an injunction. In their motion, Plaintiffs offer only a convoluted scenario of hypothetical irreparable harm: they argue that they might submit proposals to be Store operators, and that if the City selects one of their proposals, they might be liable for conspiracy to form a monopoly for agreeing in their proposals to provide the 30% discount on Core Basket goods. On its face, this theory of irreparable harm is too speculative to justify an injunction, particularly in the face of the

concrete harms that food-insecure and financially struggling New Yorkers will face if the N.Y.C. Groceries program is enjoined. But Plaintiffs' theory is also legally impossible given that the Local Government Antitrust Act of 1984 immunizes any Store operators from antitrust damages liability stemming from the discounts they agree to provide at the direction of the City and NYCEDC.

The Court should deny Plaintiffs' motion.

## STATEMENT OF FACTS

### Background

Hunger is an urgent economic and public health problem that the City cannot ignore. In 2025, roughly 30% of the City's adults were food-insecure. Kessler Decl. ¶ 14.[1] Affordability is a major barrier to accessing healthy food. *Id.* ¶¶ 11, 17. Accordingly, New Yorkers struggling to afford food are less likely to have a balanced diet with plentiful fruits and vegetables, which is associated with risks of health problems including hypertension, heart disease, diabetes, stroke, asthma, kidney disease, and cancer. *Id.* ¶¶ 13-17; Dalton Decl. ¶ 13.

Rising grocery costs and shrinking federal nutrition assistance have combined to deepen food insecurity across the City. After the pandemic, the cost of groceries increased by about 30% and never came back down. Khan Decl. ¶ 4. Nearly 80 percent of New Yorkers report concerns about rising food prices, which is unsurprising in light of Consumer Price Index data that show New York City-area grocery prices rose 3.0% in 2025, faster than the 2.4% national average. *Id.*

H.R.1 made major cuts to SNAP which are still being implemented. Dalton Decl. ¶ 8. The cuts have already had a damaging impact on New Yorkers who rely on SNAP, approximately half of whom are children or seniors. Khan Decl. ¶ 7; Dalton Decl. ¶ 8. At least 26,500 New Yorkers

[1] "Kessler Decl.," "Dalton Decl.," "Khan Decl.," "Neer Decl.," and "Sanchez Decl." refer to the October 9, 2026 declarations of Kimberly Kessler, Erin Dalton, Deandra Khan, Waverly Neer, and Siddhartha Sanchez submitted herewith.

lost their SNAP benefits as of September 2026. Khan Decl. ¶ 7. And while the full impact of the SNAP cuts is difficult to project, they are likely to push over 500,000 New Yorkers into poverty absent intervention. Dalton Decl. ¶ 12.

Even middle-income families feel strained by rising food prices. An overwhelming 86 percent of New Yorkers say the rising cost of food is outpacing their incomes. Khan Decl. ¶ 4.

There are thousands of food retailers across New York City, including full-size supermarkets, produce markets, bodegas and delis. The private grocery market is crucial to the City's food ecosystem, and maintaining that market is an important component of City policy. *Id.* ¶ 20. Food affordability and accessibility are also important City policy objectives, and existing City programs take overlapping measures to achieve these goals. *Id.* ¶¶ 19-21; Neer Decl. ¶¶ 26-27. In a City as dense as New York, residents need more food access, not less, so the City has no intention of driving private stores out of business. Khan Decl. ¶ 19.

**The City's Initiatives Addressing Hunger**

The City funds a network of over 700 food pantries and community kitchens across the five boroughs. Dalton Decl. ¶ 5. Pantries provide New Yorkers with groceries, and community kitchens directly provide hot meals. *Id.* The City also provides direct food access through programs like NeON Nutrition Kitchen, which provides free food through the Department of Probation, and the Department for the Aging's senior meals offerings. Neer Decl. ¶ 26; Sanchez Decl. ¶ 11. The City's "Get the Good Stuff," "Groceries to Go," and "Health Bucks" programs also provide free produce and payment assistance for groceries. Kessler Decl. ¶¶ 4-8; Neer Decl. ¶ 26; Sanchez Decl. ¶ 12.

However, the affordability crisis has led New Yorkers to seek out food pantries and community kitchens more often, putting strain on these existing City initiatives—food pantries

have been inundated with calls and have run out of food trying to provide for waves of families who never previously had to utilize pantries. Khan Decl. ¶ 7 n.13.

There are also City programs that support a vast infrastructure of municipal food retailers. One example is the FRESH program, which provides tax and land use breaks to encourage supermarkets to open in high-need areas. *Id.* ¶ 20. Since the FRESH program's inception in 2009, 46 full-service grocery stores have opened in such areas across the City. Sanchez Decl. ¶ 9. Similarly, Essex Market in the Lower East Side provides retail space at below-market rates to small food vendors. Khan Decl. ¶ 20. The Accelerated Sales Tax Exemption Program ("ASTEP") also provides food retailers with tax exemptions on equipment and furnishings. *Id.*; Sanchez Decl. ¶ 10. While these programs have made food more accessible in more locations, they have not significantly lowered grocery prices. Neer Decl. ¶ 34.

**The N.Y.C. Groceries Operator Procurement**

To further the City's mission to provide access to quality and affordable groceries and supplement its existing programs to address food insecurity, the City seeks to open five municipal grocery Stores by 2029, one in each borough, privately operated, but with the public aim of lowering grocery bills and increasing New Yorkers' purchasing power. Khan Decl. ¶¶ 8, 14. The City is working with NYCEDC to fulfill this vision. *Id.* ¶ 18.

On July 27, 2026, NYCEDC issued the RFP for N.Y.C. Groceries Program Operator(s). *See* Neer Decl. ¶¶ 6-7, Ex. A (the RFP). It is integral to the City's policy goals to offer a Core Basket of food and pantry items at, on average, 30% below retail prices, partially in response to the approximately 30% rise in grocery costs since the pandemic, as well as SNAP cuts. RFP, pp. 3, 13; Khan Decl. ¶¶ 10, 25. The exact Core Basket items have not been finalized, but the Core Basket will include produce, meat, and seafood. RFP, pp. 13, 28-29. NYCEDC and Store

operator(s) will collaborate to determine the exact items. *Id.* The Stores must accept SNAP and other benefit programs including the Special Supplemental Nutrition Program for Women, Infants, and Children. RFP, p. 5. The terms of the solicitation also prohibit Store operators from charging above-market rates for non-Core Basket items. Neer Decl. ¶ 37; RFP, p. 14.

To advance the City's food accessibility goals, N.Y.C. Groceries will provide upfront investments into interior construction fit-outs of the five Stores, as well as ongoing financial support for rent, property taxes, and operating subsidies. Neer Decl. ¶¶ 36-37. The RFP contemplates a 10-year agreement with operator(s) whereby the parties will agree to maintain the 30% discount, ensuring a long-term commitment to addressing the affordability crisis. *Id.* ¶¶ 37-38.

To date, two Store sites have been identified: (1) the Bronx site, located in Hunts Point, with a target opening in the second half of 2027, and (2) the Manhattan site, located in East Harlem, with a target opening in 2029. RFP, p. 9. The Brooklyn, Staten Island and Queens sites have not yet been identified. All five sites will be in areas zoned for grocery retail under City zoning or through FRESH program incentives. Neer Decl. ¶ 8. The City intends to locate the Stores in areas with low supermarket access. Khan Dec. ¶ 9. The two announced Stores will open in neighborhoods where the share of households receiving SNAP benefits is above the Citywide average. *Id.* ¶¶ 12-13. The Bronx Store in particular is expected to bring economic relief and a community anchor to Hunts Point. Sanchez Decl., Ex. 2 (letter from Hunts Point community organization). A neighborhood grocery store has been central to the vision of the Hunts Point neighborhood for years, and the City intends to keep this commitment. Khan Decl. ¶ 30; Sanchez Decl. ¶ 8, Ex. 2.

The N.Y.C. Groceries program is unique in some respects, but in addition to other City programs offering subsidies and food assistance discussed above, cities across America have successfully run similar public retail programs to deliver food, fuel, and other basic necessities at lower prices. For example, Atlanta, Georgia opened Azalea Fresh Market in 2025, which was subsidized by the City of Atlanta and operated privately to provide much-needed affordably priced fresh groceries; Madison, Wisconsin secured a long-term lease for a grocery store within a city-owned mixed-use development; Erie, Kansas purchased its own grocery store to save it from shutting down; and St. Paul, Kansas opened a city-owned and community-supported grocery store. Sanchez Decl. ¶ 17. In 2014, the city of Somerset in Kentucky opened a municipally-owned and operated gas station that set prices based on average regional prices and a small markup to cover costs. Thomas M. Hanna, *Kentucky Town Beats High Gas Prices—By Opening a Public Gas Station*, YES! SOLUTIONS JOURNALISM (Sept. 13, 2014), https://www.yesmagazine.org/economy/2014/09/13/kentucky-town-beats-high-gas-prices-by-opening-a-public-gas-station.

Numerous community groups have voiced their support for N.Y.C. Groceries. *See* Sanchez Decl., Exs. 1, 2, 3, 4. They agree that the program will fill an affordability gap that the market alone has not addressed (*Id.*, Exs. 1-2), and create well-paying jobs (*Id.*, Exs. 3-4). Members of the Hunts Point and East Harlem communities, where the first Store sites have been identified, are eager to see Stores that reflect the needs, cultures, and tastes of the people who live there. *Id.*, Exs. 1, 3-4.

## ARGUMENT

## LEGAL STANDARD

To obtain the extraordinary relief of a preliminary injunction, a litigant must establish "(1) irreparable harm; (2) either (a) likelihood of success on the merits, or (b) sufficiently serious

questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *Conn. State Police Union v. Rovella*, 36 F.4th 54, 62 (2d Cir. 2022) (internal citation and quotation marks omitted). The Second Circuit has held that "where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim." *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989) (internal citations omitted).

The City has a well-established interest in the health, safety, and well-being of its residents, and the New York Constitution and Municipal Home Rule Law expressly recognize the City's police power to address these issues. *See* N.Y. Const. art. IX, § 2(c)(10); N.Y. Mun. Home Rule Law § 10(1)(ii)(a)(12). Consistent with that authority, the City has implemented measures to combat food insecurity and promote access to affordable food. Khan Decl. ¶ 20; Neer Decl. ¶ 26. The City and NYCEDC are implementing the N.Y.C. Groceries program as part of these ongoing efforts (Khan Decl. ¶¶ 8, 14), which the City is undertaking pursuant to a statutory scheme. *See* N.Y. City Charter § 20-i (establishing Mayor's Office of Food Policy, which is charged with developing a "comprehensive 10 year food policy plan" that "shall include implementation strategies to achieve the recommendations made" for *inter alia* "reducing hunger," "improving nutrition," "increasing access to healthy food," and "[d]eveloping and improving food and farm economies").

Thus, Plaintiffs must satisfy the higher "likelihood of success on the merits" standard. However, regardless of which standard applies, for the following reasons, Plaintiffs do not

establish irreparable harm, fair grounds for litigation, a balance of the hardships tipping decidedly in their favor, or that a preliminary injunction is in the public interest, so the Court should deny Plaintiffs' motion.

## POINT I

## PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS, NOR DO THEY ESTABLISH FAIR GROUND FOR LITIGATION

To prove their attempted monopolization claim, Plaintiffs must "prove that (1) the [City and NYCEDC] ha[ve] engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports v. McQuillan*, 506 U.S. 447, 448 (1993). To prove their conspiracy to monopolize claim, Plaintiffs must set forth "(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy." *Sample, Inc. v. Pendleton Woolen Mills, Inc.*, 704 F. Supp. 498, 505 (S.D.N.Y. 1989). Because Plaintiffs' claims are premised on a predatory pricing theory, they must additionally prove that (1) the City and NYCEDC are setting prices "below an appropriate measure of [their] costs," and (2) the City and NYCEDC have "a dangerous probability[] of recouping [their] investment in below-cost prices." *Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-224 (1993).

Plaintiffs cannot prove that the City and NYCEDC have a dangerous probability of recouping their investment in below-market prices, dooming both of Plaintiffs' claims, because N.Y.C. Groceries operators will need to commit to maintain affordable prices (Neer Decl. ¶¶ 37-38), and Plaintiffs concede that there is nothing compelling the City and NYCEDC, which are not motivated by profit, to set supra-competitive recoupment prices (ECF No. 1 ¶¶ 14-15; ECF No.

29, p. 19). Plaintiffs cannot prove the monopolistic intent element of each of their claims because the City does not intend to set recoupment prices after driving out competition, nor does it intend to drive out competition at all. Khan Decl. ¶¶ 19-21; Neer Decl. ¶¶ 3-4. And Plaintiffs cannot prove a dangerous probability of achieving monopoly power, which is a prerequisite of recoupment through supra-competitive monopoly pricing, because they fail to establish that N.Y.C. Groceries program Stores will obtain sufficient market share to exercise monopoly power, or even define a relevant geographic or product market.

**A. Plaintiffs Fail to Establish or Even Allege Potential Recoupment or Harm to Consumers**

The purpose of federal antitrust laws is to protect the interests of consumers by way of protecting "*competition*, not *competitors*." *Brooke Grp*, 509 U.S. at 224 (emphasis in original); *see also Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 259 (2d Cir. 2001) (holding that "[f]oremost among" the "concepts underlying antitrust law . . . is the notion that competition fosters consumer welfare" in the form of "lower prices for consumers," and affirming judgment for defendant on attempted monopolization claim because plaintiff failed to establish consumer harm). "Low prices benefit consumers regardless of how those prices are set." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990).

This consumer welfare principle is the reason courts require predatory pricing claimants like Plaintiffs to establish "recoupment," *i.e.*, a "dangerous probability" that the City and NYCEDC might "recoup[] [their] investment in below-cost prices." *Pac. Bell Tel. Co. v. linkLine Communs., Inc.*, 555 U.S. 438, 451 (2009) (internal quotation marks omitted). Specifically, Plaintiffs need to prove that there is a dangerous probability that the City and NYCEDC will obtain market power after eliminating competition, and then make monopoly profits by "rais[ing] . . . prices" for Core Basket goods above a competitive level "and . . . sustain[ing] those prices long

enough to earn in excess profits what they gave up in below-cost prices." *Brooke Grp. Ltd.*, 509 U.S. at 25-26.[2]

However, Plaintiffs make no attempt to establish recoupment, and indeed concede that the City and NYCEDC can maintain the 30% Core Basket discount indefinitely, without ever seeking recoupment. Compl., ECF No. 1 ¶¶ 14-15; ECF No. 29, p. 19. The Complaint contains a stray, conclusory allegation that "once competition is eliminated there is a dangerous probability that Stores will attempt to recoup at least some costs by raising prices of non-Core Basket items to monopoly levels." Compl. ¶ 92. This allegation is false and absurd. The RFP mandates that, for non-Core Basket items, Stores must "set prices that are comparable to typical retail prices within New York City." RFP, p. 14. Additionally, Plaintiffs do not rely on their allegation regarding a potential rise in non-Core Basket prices in their motion, and make no effort to substantiate the allegation with any specific facts that would be necessary to support the recoupment element of a predatory pricing claim. For instance, Plaintiffs would need to establish substantial barriers to entry in the market for non-Core Basket items. *See Smith & Johnson, Inc. v. Hedaya Home Fashions, Inc.*, No. 96 Civ. 5821 (MBM), 1996 U.S. Dist. LEXIS 19023, at *22 (S.D.N.Y. Dec. 24, 1996) (granting 12(b)(6) motion to dismiss predatory pricing antitrust claims where plaintiff failed to allege high barriers to entry); *Ne. Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 89 (2d Cir. 1981) ("[I]n industries in which entry is easy, predatory pricing will not pay."). But Plaintiffs fail to allege any such barriers that would prevent competitors from re-entering the market if the City and

---

[2] As discussed in Point I.C, *infra*, Plaintiffs concede that they must establish a dangerous probability of monopoly power (ECF No. 29, pp. 21-22), which conflicts with their assertion that they need not establish recoupment, since the reason courts require a showing of monopoly power is to determine whether a monopolist will have the power to maintain "price[s] substantially above the competitive level." *See AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*, 181 F.3d 216, 226-27 (2d Cir. 1999).

NYCEDC were to drop their commitment to affordability and allow the Stores to begin charging monopoly prices on non-Core Basket items. And even if Plaintiffs did substantiate their allegation of potential monopoly pricing in non-Core Basket goods, this would not establish recoupment because "monopoly profits must come in the same product market in which a defendant is alleged to have engaged in predatory pricing." *Synergetics USA, Inc. v. Alcon Labs., Inc.*, No. 08 CIV. 3669 (DLC), 2009 U.S. Dist. LEXIS 47466, at *10 (S.D.N.Y. June 4, 2009).

Instead of attempting to establish recoupment, Plaintiffs assert that doing so is unnecessary. Plaintiffs offer no authority supporting their position, and instead simply argue that because N.Y.C. Groceries is a government-supported program, the Court should disregard the recoupment requirement, against decades of precedent. ECF No. 29, pp. 18-20.

Contrary to Plaintiffs' argument, in *Outbound Marine Corporation v. Pezetel*, the plaintiff alleged that the defendants took advantage of foreign government subsidies to undercut their competitors' prices for golf carts, and the Delaware District Court rejected the plaintiff's assertion that this constituted predatory pricing under Sherman Act Section 2. 461 F. Supp. 384, 405 (D. Del. 1978). *Outbound Marine Corporation* preceded the Supreme Court's articulation of the recoupment requirement in *Brooke Group*, but it explicitly rejected the contention that using a government subsidy to offer lower prices was any more inherently anticompetitive than taking advantage of "technology[, or] cheap labor . . . to offer the same product at a reduced price." *Id.*

Moreover, in making their argument that they need not establish recoupment, Plaintiffs disregard that the "[f]oremost" purpose of antitrust law is "foster[ing] consumer welfare" through "lower prices." *Virgin Atl. Airways*, 257 F.3d at 259; *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016) ("The principal objective of antitrust policy is to maximize consumer welfare by encouraging firms to behave competitively.") (internal alteration marks omitted) (quoting

*Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 539 (2013)). Plaintiffs cannot dispute that the N.Y.C. Groceries program, particularly the planned 30% discount on Core Basket goods, will improve consumer welfare, and certainly will not harm consumers. Thus, the Court should reject Plaintiffs' unsupported argument that the Court should deviate from controlling precedent requiring that Plaintiffs establish recoupment.

In their attempt to argue against precedent requiring that they establish recoupment, Plaintiffs correctly note that Courts are wary of "erroneously condemning legitimate competitive advantages as unfair pricing." ECF No. 29, p. 19. "[A] business entity is not guilty of predatory conduct through excluding its competitors from the market when it is simply exploiting competitive advantages legitimately available to it." *Virgin Atl. Airways*, 257 F.3d at 266. Plaintiffs imply—without basis—that any subsidies the City provides to support the 30% discount on Core Basket goods are not "legitimate." *See* ECF No. 29, p. 19. Thus, Plaintiffs contend that the Court should treat the City and NYCEDC less favorably than it would treat a non-governmental antitrust defendant. *Id.*, pp. 18-20. But there is nothing illegitimate about using government subsidies to provide quality food products to consumers at more affordable prices—the Court should be just as wary of erroneously condemning City subsidies as unfair as any other legitimate competitive advantage. *See Outbound Marine Corp.*, 461 F. Supp. at 405 ("a firm that exploits the opportunity through technology, cheap labor or a government subsidy to offer the same product at a reduced price" does not thereby violate the Sherman Act).

For these reasons, Plaintiffs' failure to establish potential recoupment or consumer harm means they cannot establish likelihood of success on the merits or fair grounds for litigation.

**B. N.Y.C. Groceries Is Intended to Improve Affordability, Not Form a Monopoly**

As Plaintiffs concede, "specific intent to monopolize" is an essential element of their attempted monopolization claim. ECF No. 29, pp. 20-22; *Tops Mkts., Inc. v. Quality Mkts., Inc.*,

142 F.3d 90, 101 (2d Cir. 1998) (attempted monopolization plaintiff must establish "specific intent to destroy competition or build monopoly"). An antitrust defendant that seeks to gain market share, but does not "intend[] to vanquish their opposition," lacks monopolistic intent. *Ne. Tel. Co.*, 651 F.2d at 85. Where, as here, the plaintiff relies on a predatory pricing theory, it must establish intent to "deliberate[ly] sacrifice . . . present revenues for the purpose of driving rivals out of the market and then recouping the losses through higher profits earned in the absence of competition." *Id.* at 86.

That is demonstrably not the case here. The purpose of N.Y.C. Groceries is not to form a profitable monopoly, but rather to address the City's affordability crisis by making grocery essentials affordable and accessible to more New Yorkers. Khan Decl. ¶¶ 14-17; Neer Decl. ¶¶ 3-4. The program's planned 30% discount on Core Basket items in particular is meant to address, *inter alia*, the fact that the cost of groceries has increased by roughly 30% since the pandemic. *See* Khan Decl. ¶¶ 4, 25. As discussed in Point I.A above, Plaintiffs do not dispute that the City and NYCEDC have no intent to recoup monopoly profits by raising prices. This alone proves that the City and NYCEDC lack monopolistic intent.

But the City and NYCEDC also do not intend to destroy competitors. The City recognizes that the private grocery market is core to the City's food ecosystem, and the five N.Y.C. Groceries program Stores are meant to complement the roughly 1,000 grocery stores that already exist across the City, not replace them. Khan Decl. ¶ 19. Furthermore, to encourage New Yorkers to continue patronizing bodegas, grocery stores, and other retailers that sell freshly prepared food, the program Stores will not offer onsite customer-facing food preparation. Neer Decl. ¶ 24. Moreover, the City has supported and will continue to support private grocers through programs like the FRESH

program and ASTEP, whereby the City provides tax breaks and other benefits to supermarkets, bodegas, and other private food retailers in underserved communities. Khan Decl. ¶ 20.

Because the City and NYCEDC lack monopolistic intent, Plaintiffs' claims cannot succeed.

### C. Plaintiffs Fail to Establish That Defendants Have a Dangerous Probability of Achieving Monopoly Power

Even if Plaintiffs could show that the City and NYCEDC had monopolistic intent—which they clearly cannot—their claims would fail because they fail to establish a "dangerous probability" that the City and NYCEDC "will attain monopoly power." *AD/SAT*, 181 F.3d at 226-227. The City and NYCEDC intend to open five Stores in a city of 8 million people and roughly 1,000 private grocery stores; the idea that these stores could establish a monopoly is absurd. To establish a dangerous probability of monopoly power, Plaintiffs would need to show that the City and NYCEDC have "the ability (1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by new entry or expansion." *AD/SAT*, 181 F.3d at 226-227 (2d Cir. 1999) (emphasis in original). Plaintiffs concede that they are required to establish a dangerous probability of monopoly power for their attempted monopolization claim. ECF No. 29, pp. 21-22. Significantly, this conflicts with their assertion that they need not establish a risk of recoupment through supra-competitive pricing (*id.*, pp. 18-21), since the whole reason courts require a monopoly power showing is to determine whether the attempted monopolist will have the ability to raise "prices substantially above the competitive level." *AD/SAT*, 181 F.3d at 228.

To "determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports*, 506 U.S. at 456; *see also City of N.Y. v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011). The proposed relevant market "must bear a rational relation

to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 237-38 (2d Cir. 2008). Plaintiffs must allege both a relevant geographic market and product market. *See Concord Assocs., L.P. v. Entertainment Props. Trust*, 817 F.3d 46, 52 (2d Cir. 2016) (*citing Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 574 (S.D.N.Y. 2011)). "Once the relevant market is determined," courts also "consider a variety of factors in addition to the defendant's market share, including . . . barriers to entry," which are a prerequisite for market power. *AD/SAT*, 181 F.3d at 226.

As a threshold matter, Plaintiffs fail to allege that N.Y.C. Groceries will obtain sufficient market share for monopoly power. Courts routinely dismiss antitrust claims for failure to allege sufficient market share. *See, e.g.*, *H.L. Hayden Co. of N.Y., Inc. v. Siemens Medical Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989) (20 percent market share in a widely diversified and competitive market was insufficient to establish a dangerous probability of achieving monopoly power) (citing *Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.*, 614 F.2d 832, 841 (2d Cir. 1980) (one-third market share inadequate)); *U.S. v. ALCOA*, 148 F.2d 416, 424 (2d Cir. 1945) (same); *Levitch v. CBS*, 495 F. Supp. 649, 665 (S.D.N.Y 1980) (same). Plaintiffs' purported expert declaration attacks N.Y.C. Groceries for creating a monopoly without opining on what percentage market share the Stores are likely to achieve. *See generally* ECF No. 13. In fact, the Complaint alleges nothing concerning market share. *See generally* Compl. The fact that Plaintiffs cannot even estimate what market share they think the N.Y.C. Groceries program Stores will achieve shows that their allegations of attempted monopolization are too speculative to support a claim. To the extent Plaintiffs assert that the N.Y.C. Groceries program will have market power by mere virtue of the fact that it will be backed by the City's resources, this is insufficient to support a monopoly power finding. *Cf.*

*U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 614, 617 (1977) (reversing finding that antitrust defendants had market power because *inter alia* defendants "were owned by one of the Nation's largest corporations," and holding that "[t]h[is] fact tells us nothing about the extent of [defendants]' economic power in the [relevant] market").

Moreover, Plaintiffs allege no barriers to entry that would prevent competitors from re-entering the market if N.Y.C. Groceries program Stores were to begin charging monopoly prices on non-Core Basket items. *See generally* Compl. This also is a threshold issue precluding a finding of attempted monopolization. *AD/SAT*, 181 F.3d at 229 (holding that "low barriers to market entry suggest[ed] that [antitrust defendant] will face significant competition from new entrants," precluding finding of dangerous probability that defendant would obtain monopoly power to set supra-competitive prices); *Ne. Tel. Co.*, 651 F.2d at 89 ("[I]n industries in which entry is easy, predatory pricing will not pay.").

Furthermore, in an attempt to articulate a plausible theory of monopoly, Plaintiffs define the relevant geographic market unrealistically narrowly, contending that the relevant geographic market is the ¾ mile radius around the two announced Store locations. Compl. ¶¶ 79-82. However, the City and NYCEDC intend for the N.Y.C. Groceries program's five Stores to attract New Yorkers from across the City. Khan Decl. ¶ 19; Neer Decl. ¶ 23; RFP, p. 3. Thus, the City and NYCEDC intend for the Stores to compete in a much larger geographic market, which is achievable given the transit options available to New Yorkers. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 454 (1992) ("proper market definition" must account for "commercial realities" of the industry). As Plaintiffs concede, the announced Stores are likely to draw in consumers from a wider geographic area than a typical grocery store due to the Core Basket discount and their proximity to the 6 train. ECF No. 13 ¶¶ 22-25; ECF No. 29, p. 7.

Accordingly, Plaintiffs' alleged geographic market consisting of two ¾ mile geographic radii, around two Stores that have not yet opened, is too speculative to support their claims because Plaintiffs fail to present a plausible basis for excluding food retailers outside of this very small area from the purported market. *See Concord Assocs., L.P.*, 817 F.3d at 53-54 (rejecting plaintiff's proposed geographic market for failing to present plausible basis for excluding reasonably accessible locations outside boundaries of speculative geographic market).

Plaintiffs' attempted definition of the relevant product market also cannot support their claims. "A relevant product market consists of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956)) (internal quotation marks omitted). Plaintiffs submit a declaration from a purported expert asserting that "Core Basket products account for approximately 64% of the sales of a representative neighborhood supermarket" (ECF No. 13 ¶ 44), and based on this assert that "the product market is general consumer groceries encompassing retail grocery stores where more than 64% of average annual sales consist of [Core Basket] items." ECF No. 29, p. 6. This purported definition is too unclear as it fails to explain the term "general consumer groceries" and what products it covers, making it impossible for the Court to analyze whether the definition properly includes all "reasonably interchangeable" products. *See Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 142 F. Supp. 2d 296, 303 (E.D.N.Y. 2001) (rejecting proposed product market definition of "fluid milk products" because it failed to "explain what 'fluid milk products' are"); *PepsiCo, Inc.*, 315 F.3d at 105.

To the extent Plaintiffs seek to define the product market by reference to the term Core Basket, their definition must still fail, as the City and NYCEDC have not yet finalized what exact

items will be part of the Core Basket. RFP, pp. 13, 28-29 (RFP lists anticipated "Core Basket Categories," but does not specifically define "Core Basket," and states "[o]perators and NYCEDC will collaborate to determine Core Basket Categories, items, and prices"). N.Y.C. Groceries will not offer the same range of products and services as Plaintiffs' stores; the City and NYCEDC do not intend for Stores to have deli counters, butcher counters or other specialty items that other grocers carry, and will encourage New Yorkers to continue to visit other food retailers for freshly prepared foods. RFP, p. 11; Neer Decl. ¶ 24.

Accordingly, Plaintiffs' motion must be denied because they establish neither a likelihood of success on the merits nor fair grounds for litigation.

## POINT II

## PLAINTIFFS FAIL TO ESTABLISH IRREPARABLE HARM ABSENT AN INJUNCTION

"[T]he single most important prerequisite for the issuance of a preliminary injunction [is] irreparable harm." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 358 (2d Cir. 2024) (internal quotation marks omitted). To qualify for the extraordinary remedy of preliminary injunctive relief, a plaintiff must establish that its threatened injury is "not only possible but likely," and "not remote or speculative[,] but actual and imminent." *Daileader*, 96 F.4th at 358 (internal quotation marks and alteration marks omitted); *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002). A plaintiff must establish irreparable harm to obtain a preliminary injunction, notwithstanding the other preliminary injunction factors. *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 68 (2d Cir. 2007) (affirming denial of preliminary injunction, holding that "[t]he finding of no showing of irreparable harm is dispositive," and "there is no need . . . to consider the merits of the [plaintiff's] federal antitrust and dormant Commerce Clause claims"); *Kamerling*, 295 F.3d at 214 ("A party seeking a preliminary injunction must

establish irreparable harm ***and*** either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in its favor.") (emphasis added).

For the following reasons, Plaintiffs have failed to demonstrate the prospect of any irreparable harm absent an injunction, so regardless of the merits of Plaintiffs' claims, or lack thereof, the Court should deny Plaintiffs' motion.

### A. The Local Government Antitrust Act Immunizes Plaintiffs and Other Potential N.Y.C. Groceries Operators from Any Antitrust Damages Liability Resulting from Complying with the Instructions in the RFP

Even assuming *arguendo* the 30% discount could somehow be construed as an antitrust violation, Plaintiffs' argument for irreparable harm fails because the Local Government Antitrust Act of 1984 (the "LGAA") immunizes any N.Y.C. Groceries operator from any liability for antitrust damages that might result from agreeing to the City and NYCEDC's directive in the RFP to price, and be prepared to sell, Core Basket goods at a 30% discount. The LGAA immunizes antitrust defendants from all damages liability under the Sherman and Clayton Acts "based on any official action directed by a local government" such as the City. 15 U.S.C. §§ 34, 36. Though the LGAA does not provide immunity from suits seeking injunctive relief, by limiting suits for damages based on the acts of local governments, the LGAA is meant to "allow local governments to go about their daily functions without the paralyzing fear of antitrust lawsuits." *Sandcrest Outpatient Servs., P.A. v. Cumberland Cnty. Hosp. Sys., Inc.*, 853 F.2d 1139, 1142 (4th Cir. 1988) (quoting S. Rep. No. 593, 98th Cong., 2d Sess. 2 (1984)).

Plaintiffs allege that Plaintiff The Real Chance, Inc., d/b/a City Fresh ("City Fresh") and non-party Palero Food Corp. ("Palero"), which is a member of Plaintiff National Supermarket Association, may submit proposals to operate N.Y.C. Groceries program Stores, in response to NYCEDC's RFP. Compl. ¶ 41; ECF No. 29, p. 6. Plaintiffs assert that when NYCEDC selects a

proposal, the selected proposer may be liable for conspiracy to monopolize, because the proposal will need to include a 30% discount on Core Basket goods, which Plaintiffs allege would be predatory pricing. ECF No. 29, p. 23. It is undisputed that NYCEDC is requiring proposals to commit to the 30% Core Basket discount as part of the RFP at the City's direction. Khan Decl. ¶ 25; Neer Decl. ¶¶ 13-14. But Plaintiffs argue that a selected operator, by mere virtue of having agreed to commit to the 30% discount in their proposal, in compliance with the City's directive and NYCEDC's RFP, could be party to a conspiracy to monopolize. ECF No. 29, pp. 22-23. Because NYCEDC theoretically could select City Fresh or Palero's proposals, Plaintiffs argue that they need an injunction barring the City and NYCEDC from choosing a winning proposal to avoid the harm of having their proposal selected and incurring antitrust liability. *Id.*, pp. 6, 23-26. This is Plaintiffs' only asserted theory of irreparable harm, and it necessarily fails.

Courts consider a non-governmental party's actions to be "directed by a local government," and thus protected under the LGAA, if the alleged anticompetitive conduct was authorized by "clearly articulated and affirmatively expressed" local government policy, and "actively supervised by the [local government] itself." *Sandcrest*, 853 F.2d at 1143-1144 (internal quotation marks omitted); *New Phone Co. v. N.Y. City Dep't of Info. Tech. & Telecomms.*, No. 03 CV 3978 (JG) (KAM), 2006 U.S. Dist. LEXIS 100976, at *92-93 (E.D.N.Y. Aug. 25, 2006) (Matsumoto, Mag. J.) (following *Sandcrest* and holding Verizon was immune, pursuant to LGAA, from damages on plaintiff's antitrust claims), *adopted by* 2006 U.S. Dist. LEXIS 100978 (E.D.N.Y. Oct. 12, 2006), *aff'd*, 355 Fed. Appx. 503, 506 (2d Cir. 2009). In *Sandcrest*, the defendant hospital management company, which managed a county-owned hospital, terminated an emergency room service contract with the plaintiff, allegedly as part of a conspiracy in restraint of trade. 853 F.2d at 1141. The court found that the management company was protected by the LGAA, despite that

it was not itself a local government, because the county hospital system's bylaws authorized the company to recommend termination of contracts, and the county hospital system's board approved the award of the emergency room contract to another entity. *Id.* at 1143-1144. The defendant management company had thus terminated the plaintiff's emergency room service contract at the implicit direction of the county hospital system, which was an arm of local government. *Id.*

Even if a Store operator's agreement to offer Core Basket goods at a 30% discount could potentially violate antitrust law, which it does not, the operator would be protected by the LGAA because the 30% discount was directed by the City, a local government entity. The 30% discount is not merely authorized by the City's "clearly articulated and affirmatively expressed" policy of increasing access to healthy, affordable food, but specifically required by the City in furtherance of that policy in the RFP. Khan Decl. ¶¶ 25, 27; Neer Decl. ¶ 13. And the City and NYCEDC will actively supervise the implementation of the 30% discount—Store operators will need to enter into contractual relationships with NYCEDC and the City whereby they will agree to offer the 30% discount, and operators' prices will be subject to NYCEDC approval. Khan Decl. ¶ 25; Neer Decl. ¶ 37; RFP, p. 13 ("The Operator(s) will set prices, subject to NYCEDC approval, targeting an average discount of 30% relative to the retail price."), p. 28 ("Pricing for Core Basket items will be the same across all five (5) NYC Grocery store locations, subject to monthly review.").

Accordingly, contrary to Plaintiffs' sole claim of potential irreparable harm, there is no risk that any N.Y.C. Groceries operator could incur antitrust damages liability, barring injunctive relief.

**B. Plaintiffs' Alleged Irreparable Harm Is Too Speculative to Support an Injunction**

Even if not for the LGAA, Plaintiffs' alleged irreparable harm would be too speculative to justify injunctive relief, particularly when compared to the concrete harms to food-insecure New Yorkers if N.Y.C. Groceries is enjoined. Again assuming *arguendo* that an RFP proposer selected to be a Store operator could incur antitrust liability, the mere prospect that Plaintiff City Fresh or

Palero *might* submit proposals to operate Stores, that NYCEDC *might* select City Fresh or Palero's proposals, and that City Fresh and Palero *might* thereafter be sued for conspiring to form a monopoly, does not establish a threat of injury that is "not only possible but likely," and "not remote or speculative[,] but actual and imminent," as necessary to support an injunction. *Daileader*, 96 F.4th at 358 (internal quotation marks and alteration marks omitted); *Kamerling*, 295 F.3d at 214.

While Plaintiffs assert that non-Plaintiff Palero will submit an RFP proposal, they notably do not assert that City Fresh will submit a proposal—only that City Fresh is "ready, willing, and able to submit a proposal." Compl. ¶ 41; ECF No. 29, p. 6. Plaintiffs' assertion that Palero will submit an RFP proposal is not supported by an affidavit from Palero or other evidence, and "to establish standing for a preliminary injunction, a plaintiff cannot rest on . . . mere allegations . . . but must set forth by affidavit or other evidence specific facts." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (internal quotation marks and alteration marks omitted). And the fact that Plaintiff City Fresh does not articulate an intention to submit a proposal, but merely that it is "willing" to possibly submit a proposal, underscores the extent to which Plaintiffs' asserted irreparable harm is speculative, and not likely, actual, or imminent.

The Eastern District's decision denying a preliminary injunction in *L&M Bus Corporation* is instructive. In *L&M*, bus companies sought to enjoin a City Department of Education bus contract procurement on grounds that the contract could conflict with the NLRA, ERISA, and collective bargaining agreements that bound the bus companies. *L&M Bus Corp. v. Bd. of Educ. of the City Sch. Dist. of N.Y.*, No. 18-CV-1902 (NGG) (SMG), 2018 U.S. Dist. LEXIS 88354, at *20 (E.D.N.Y. May 25, 2018). The bus companies advanced an irreparable harm argument nearly identical to the one advanced by Plaintiffs here: the bus companies argued that they were "being

forced into an untenable 'Hobson's choice': bid, and risk exposure to multiple sources of liability; or refuse to bid, and risk being forced to go out of business." *Id.* at *14. The court rejected this alleged harm as "too speculative," explaining that it "cannot enjoin a contract based on speculations of future conflict" between the terms of the contract and the NLRA, ERISA, and collective bargaining agreements, "without any concrete basis for the harms' supposed imminence." *Id.* at *14-15; *see also* No. 18-CV-1902 (NGG) (SMG), 2018 U.S. Dist. LEXIS 58352, at *8-15 (E.D.N.Y. Apr. 5, 2018) (denying TRO at earlier stage of same litigation for similar reasons).

Plaintiffs cite cases for the proposition that there would be irreparable harm if they were denied the right to participate in a fair bidding process to be a N.Y.C. Groceries operator, yet offer no argument that the RFP process will be unfair. ECF No. 29, pp. 24-25 (citing *Glenwood Bridge v. City of Minneapolis*, 940 F.2d 367, 371-372 (8th Cir. 1991) (bid specification precluded appellant from bidding); *United Techs. Comm'ns Co. v. Wash. Cnty. Bd.*, 624 F. Supp. 185, 188-89 (D. Minn. 1985) (deviation from a fair bidding process with irregular ratings and awarding proposal that materially deviated from solicitation); *United Int'l Investigative Servs. Inc. v. U.S.*, 41 Fed. Cl. 312, 323-24 (1998) (deviation from fair bidding process because awardee had lower technical score and higher cost)). Plaintiffs are situated identically to every other potential RFP proposer and allege no impropriety in the procurement process, only that once NYCEDC selects an operator as part of the N.Y.C. Groceries procurement, the resulting arrangement between NYCEDC, the City, and the operator could allegedly violate antitrust law. Moreover, Plaintiffs' amended motion brief drops the allegation that "Plaintiff City Fresh and Palero are reluctant to submit RFP proposals due to its potential violation of antitrust law," and now alleges that Palero intends to submit a proposal "[b]ased on the Defendants' representation that the N.Y.C. Groceries

program awards will not be decided prior to December 1, 2026." *Compare* ECF No. 14, p. 6 *with* ECF No. 29, p. 6. Thus, there is now no dispute that Plaintiffs can participate in the N.Y.C. Groceries RFP, and the cases Plaintiffs cite are irrelevant.[3]

Accordingly, Plaintiffs fail to allege irreparable harm as necessary to support an injunction, and their motion must be denied.

## POINT III

## THE PUBLIC INTEREST AND BALANCE OF HARDSHIPS WARRANT DENYING AN INJUNCTION

Plaintiffs will face no hardship if N.Y.C. Groceries proceeds on schedule, whereas City residents would face great hardship if an injunction denies them the benefit of access to affordable groceries. The City faces an affordability crisis with particular impact on food-insecure New Yorkers. After the pandemic, the cost of groceries increased by roughly 30 percent. Khan Decl. ¶ 4. This burden is not shared equally. *Id.* ¶ 5. On average, households in the New York metropolitan area spend about 6 percent of their income on groceries, but for lower-income New Yorkers, that share can reach 25 percent. *Id.* Cuts to federal programs following H.R.1 are making this crisis more acute—at least 26,500 New Yorkers have already lost SNAP benefits as of this September; they are likely to push over 500,000 New Yorkers each into poverty absent intervention. Khan Decl. ¶ 7; Dalton Decl. ¶¶ 12, 14.

[3] The *L&M Bus Corporation* TRO denial decision expressly distinguishes from and confirms the irrelevance of Plaintiffs' case *Glenwood Bridge v. City of Minneapolis*. 2018 U.S. Dist. LEXIS 58352 at *13 (citing *Glenwood Bridge*, 940 F.2d at 368, 372). The court explained that in *Glenwood Bridge*, the party seeking to enjoin the procurement had been actually been precluded from submitting a bid, whereas in *L&M*, like here, the plaintiffs were not "actively imped[ed] from submitting bids," and thus had not established irreparable harm. *Id.*

If the Court grants a preliminary injunction, it will significantly delay the progress of the N.Y.C. Groceries program and prevent the program from providing cost-of-living relief to New Yorkers, particularly residents of East Harlem and Hunts Point who would lose a resource they are counting on at a time when they urgently need greater food stability. Khan Decl. ¶¶ 29-30; Neer Decl. ¶ 46; Sanchez Decl., Ex. 4 (letter from East Harlem community organization), Ex. 2 (letter from Hunts Point community organization). New Yorkers struggling to afford food are less likely to consume a healthy diet, which is associated with risks of health problems including diabetes, hypertension, stroke, heart disease, and cancer. Kessler Decl. ¶¶ 14-17; Dalton Decl. ¶ 13. An injunction would stop the City from timely addressing these problems, which could have irreversible public health impacts.

Furthermore, even if eventually lifted, a preliminary injunction would jeopardize N.Y.C. Groceries and the substantial public investment already made in the program. Neer Decl. ¶ 46. An injunction-caused delay would increase the program's capital budget and create uncertainty that would significantly disrupt construction, product sourcing and contracting, and operational implementation, potentially compromising the City's ability to provide reliable access to essential groceries. *Id.* ¶¶ 47-49.

However, if the Court denies an injunction, Plaintiffs still avoid any imagined risk of incurring antitrust liability for participating in N.Y.C. Groceries—their supposed irreparable harm—under the LGAA. And if Plaintiffs nonetheless believe they can only avoid liability by voluntarily withdrawing from consideration to be Store operators, then their only loss would be a potential business opportunity. Harm to a plaintiff's financial interests does not outweigh the government and the public's interest in providing important public services. *See City of Newburgh v. Richardson*, 435 F. Supp. 1049, 1061 (S.D.N.Y. 1977) (plaintiff's "financial distress"

outweighed by government's interest in executing public works projects); *Glidedowan, LLC v. N.Y. State Dep't of Health*, 768 F. Supp. 3d 503, 516-17, 525 (W.D.N.Y. 2025) (plaintiff argued that government program improperly created monopoly for certain Medicaid administration services and unconstitutionally excluded plaintiff from bidding for that monopoly in public procurement; court held that government's interest in efficient administration of Medicaid outweighed plaintiff's interests, notwithstanding that challenged government program would "effectively put [plaintiff] out of business" if not enjoined).

Accordingly, the balance of hardships and public policy favor denying Plaintiffs' motion.

**CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: New York, New York
October 9, 2026

STEVEN BANKS
Corporation Counsel of the
City of New York
*Attorney for Defendants*
100 Church Street
New York, New York 10007
(212) 356-2364

By: Daniel Crandall
Daniel Crandall
*Assistant Corporation Counsel*
Richard Schulsohn
*Chief of Commercial Law*
Amanda Papandrea
*Division Chief, Commercial & Real Estate Litigation Division*
Elisa Lee
Blake Ahlberg
*Assistant Corporation Counsel*

**WORD COUNT CERTIFICATION**

I hereby certify that the foregoing memorandum of law contains 8,722 words, in compliance with Local Civil Rule 7.1. I relied on the word count of the word-processing system used to prepare the document.

Dated: New York, New York
October 9, 2026

Daniel Crandall
Daniel Crandall
*Assistant Corporation Counsel*