**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL SUPERMARKET ASSOCIATION, R&E CORPORATION, AND THE REAL CHANCE, INC., *Plaintiffs,* -against- THE CITY OF NEW YORK and THE NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION, *Defendants.* | Case No. 1:26-cv-07729 (JLR) |

**PLAINTIFFS' REPLY TO THE DEFENDANT'S MOTION TO THE AMENDED MOTION FOR A PRELIMINARY INJUNCTION**

AMERICA FIRST POLICY INSTITUTE
1455 Pennsylvania Ave., N.W., Suite 225
Washington, D.C. 20004
Telephone: 703-637-3690

- and -

EISEMAN LEVINE LEHRHAUPT
& KAKOYIANNIS, P.C.
805 Third Avenue, 10th Floor
New York, New York 10022
212-752-1000

*Attorneys for Plaintiffs*

Dated: October 23, 2026

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....... 1

UNCONTROVERTED POINTS ....... 3

LEGAL STANDARD ....... 4

RECOUPMENT ....... 4

INTENT ....... 7

THE DEFENDANTS' MARKET POWER ....... 9

LOCAL GOVERNMENT ACT IMMUNITY ....... 10

IMMEDIATE AND IRREPARABLE HARM ....... 11

THE BALANCE OF HARDSHIPS ....... 11

CONCLUSION ....... 12

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,

472 U.S. 585 (1985)....................5

*Atlantic Richfield Co. v. USA Petroleum Co.*,

495 U.S. 328 (1990)....................5

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,

509 U.S. 209 (1993)....................4, 5

*Bronx Household of Faith v. Board of Educ. of City of New York*,

331 F.3d 342 (2d Cir. 2003)....................12

*Brown Shoe Co. v. United States*,

370 U.S. 294 (1962)....................5, 6, 9

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,

598 F.3d 30 (2d Cir. 2010)....................4

*Copperweld Corp. v. Independence Tube Corp.*,

467 U.S. 752 (1984)....................10

*FTC v. Phoebe Putney Health System, Inc.*,

568 U.S. 216 (2013)....................1, 7

*Glenwood Bridge, Inc. v. City of Minneapolis*,

940 F.2d 367 (8th Cir. 1991) ....................11

*Jefferson County Pharmacy Ass'n v. Abbott Laboratories*,

460 U.S. 150 (1983)....................7

*L&M Bus Corp. v. Board of Education of the City School District of New York*,

2018 WL 2390125 (E.D.N.Y. May 25, 2018) ....................11

*Northeastern Tel. Co. v. American Tel. and Tel. Co.*,

651 F.2d 76 (2d Cir. 1981)....................8

*Northern Pacific Railway Co. v. United States*,

356 U.S. 1 (1958)....................2, 13

*Outboard Marine Corp. v. Pezetel*,

461 F. Supp. 384 (D. Del. 1978)....................6, 7

*Parker v. Brown*,

317 U.S. 341 (1943)....................3

*Plaza Health Labs., Inc. v. Perales*,

878 F.2d 577 (2d Cir. 1989)....................4

*Reiter v. Sonotone Corp.*,

442 U.S. 330 (1979)....................2

*Union Pacific Railroad Co. v. United States*,

313 U.S. 450 (1941)....................7

*United States v. American Airlines, Inc.*,

743 F.2d 1114 (5th Cir. 1984) ....................11

*United States v. Anthem*,

855 F.3d 345 (D.C. Cir. 2017) ....................6

**STATUTES, RULES, AND OTHER AUTHORITIES**

Local Government Antitrust Act of 1984

........................................................................................................................10

Sherman Act, 15 U.S.C. § 1 et seq.

........................................................................................................................ passim

DOJ/FTC Merger Guidelines (2023)

........................................................................................................................6

Phillip Areeda & Donald F. Turner, *Predatory Pricing and Related Practices under Section 2 of the Sherman Act*, 88 Harv. L. Rev. 697 (1975)

........................................................................................................................5

## INTRODUCTION

The Defendants' opposition rests on the premise that low prices cannot violate the antitrust laws absent later recoupment of losses through higher prices. Plaintiffs do not contend that lower prices are unlawful or that government may never subsidize food access. The question presented is narrower: may a municipality agree with a private operator to offer below-market prices, reimburse the resulting deficits with taxpayer funds, and thereby eliminate the recoupment concern that underpins traditional predatory-pricing doctrine?

The Sherman Act protects competition, not government-favored competitors, and it does not permit a municipality to use taxpayer subsidies and public assets to confer an artificial competitive advantage that private firms cannot match. Defendants nevertheless contend that using tax revenues to fund the N.Y.C. Groceries program ("Program")—and offering low-cost groceries to residents regardless of need or income in select neighborhoods—is consistent with antitrust law, even if it drives nearby community supermarkets out of business. Opp. at 3[1] (arguing that it is "contrary to precedent" that "government-backed retailers that promote consumer welfare still violate antitrust law if they threaten to displace private competitors.").

This misstates the law.

First, there is little precedent applying the Sherman Act to government market participants, and even less when they grant themselves tax-supported discounts against incumbent competitors. *See*, e.g., *FTC v. Phoebe Putney Health System, Inc.*, 568 U.S. 216, 226 n.4 (2013) (Sherman Act's application to market participants still unaddressed).

[1] "Opp." refers to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction, ECF No. 37.

The Defendants' argument improperly equates consumer welfare with low prices in isolation. The Supreme Court has affirmed that the best guarantor of consumer welfare is competition in a fair market: "The essence of the antitrust laws is to ensure fair price competition in an open market." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979). Beyond low prices, competition not only promotes efficiency, quality, and innovation, but also advances political and social goals:

> The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conductive to the preservation of our democratic political and social institutions. *But even were that premise open to question, the policy unequivocally laid down by the Act is competition.*

*Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 4 (1958) (emphasis added).

The Program's unique 30% tax-supported discount disproves Defendants' claim that Plaintiffs seek "a change in settled law." Opp. at 3. Traditional predatory-pricing claims involve private businesses that risk insolvency if their gambit fails. These Defendants face no risk at all. And neither the Defendants, the four supporting non-profits, nor the Amici have contradicted Plaintiffs' claims that R&E,[2] City Fresh,[3] and other stores[4] will face closure if forced to compete with the respective Bronx and Harlem stores.

Given this focus on competition, an injunction is needed to preserve the status quo and prevent selection of a private partner until a final merits determination.

---

[2] Declaration of Rafael Nunez ("R&E Dec."), ECF No. 10, ¶ 21.
[3] Declaration of Jerry Nunez ("City Fresh Dec."), ECF No. 11, ¶ 21.
[4] Kaner Declaration ("Kaner Dec."), ECF No. 13, ¶ 51.

## UNCONTROVERTED POINTS

Based on the Defendants' responsive pleadings, the following points are uncontroverted:

- No *Parker* immunity (Memorandum at 14-18[5]):
  - Defendants have not sought antitrust immunity under *Parker v. Brown*, 317 U.S. 341 (1943).
- 30% Discount (Memorandum at 3):
  - Defendants have not challenged the permanent nature of the taxpayer-supported 30% discount on Core Basket groceries.
- Competitor harm (Memorandum at 4-5):
  - The Defendants have not challenged the assertions from Plaintiffs R&E and City Fresh that competition with the N.Y.C. Groceries stores will likely cause store closures.
- Costs (Memorandum at 11-12):
  - Defendants have not challenged Plaintiffs' assertions that the 30% discount will be below cost.
- Bond (Memorandum at 26-27):
  - Defendants have not challenged the request to waive a bond but preserve the protection of the injunction-bond rule.

[5] "Memorandum" refers to Plaintiffs' Memorandum of Law in Support of Their Amended Motion for a Preliminary Injunction, ECF No. 29.

## LEGAL STANDARD

Defendants argue that Plaintiffs must satisfy the higher "likelihood of success on the merits" rather than the "serious questions" standard. Opp. at 9. That deference only applies when the government acts "pursuant to a statutory or regulatory scheme." Opp. at 9 (quoting *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989)). However, *Plaza Health* involved a specific statute authorizing government action in response to fraudulent healthcare billing. *Id.* Here, having waived specific statutory authority and *Parker* immunity, the Defendants cannot now claim the higher "likelihood of success" standard based on non-existent statutory authorization. Given the Program's unprecedented nature and Plaintiffs' predatory pricing allegations, this preliminary injunction motion should be considered under the "serious questions" standard. *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (noting its flexibility to address "the greater uncertainties inherent at the outset of particularly complex litigation.").

## RECOUPMENT

The Defendants' primary argument is that the destruction of competition in the pursuit of low prices is no vice. Opp. at 11-14. Relying on private-predator recoupment theories, the Defendants claim that permanent taxpayer support means there is no need to raise prices to recover losses after driving out nearby businesses. Opp. at 10.

The Defendants cite *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225-26 (1993), for the proposition that high prices must be sustained "long enough to earn in excess profits what they gave up in below costs prices." Opp. at 11-12. They also cite *Atlantic*

*Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990), for the proposition that "Low prices benefit consumers regardless of how those prices are set."

However, the Defendants do not address Plaintiffs' argument that predatory pricing jurisprudence—focused on rational private actors, recoupment, competitive chilling effects, and speculative returns—is inapplicable as it developed in the private-predator context. Memorandum at 18-19. Consider *Brooke Group*'s point that high prices must be sustained long enough for the predator to recover "what they gave up in below costs prices." 509 U.S. 225-26. Unlike the private actor envisioned in *Brooke Group* who "gave up" revenues, the Defendants' tax-subsidized prices mean they "give up" nothing. The Defendants argue that N.Y.C. Groceries never need to recoup losses because taxpayers absorb them indefinitely, thus highlighting a critical distinction from the private actor in *Brooke Group*. Moreover, the very foundation of modern predatory pricing theory did not even consider governments offering goods below cost. *See* Phillip Areeda and Donald F. Turner, *Predatory Pricing and Related Practices under Section 2 of the Sherman Act*, 88 Harv. L. Rev. 697 (1975). Developed exclusively in the context of private actors, predatory pricing jurisprudence can be informative but not controlling.

The Defendants' citation from *Atlantic Richfield* that low prices benefit consumers "regardless of how those prices are set," ignores the fact that the Court was, yet again, examining private actors in a competitive free market. 495 U.S. at 340. In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 610-11 (1985), the Supreme Court upheld Section 2 liability where a competitor, *inter alia*, discounted prices below those of a rival, confirming that antitrust law condemns short-term gains that produce long-term competitive harm.

Moreover, competition has long been prized in merger analysis and prompted the oft-quoted line from *Brown Shoe Co. v. United States* that antitrust law seeks "the protection of

*competition*, not *competitors*." 370 U.S. 294, 320 (1962) (emphasis in original). The Court stated that "Congress appreciated that *occasional higher costs and prices* might result from the maintenance of fragmented industries and markets. It resolved these competing considerations in favor of decentralization." *Id.* at 344 (emphasis added). While modern jurisprudence balances competitive harm and efficiencies the focus on competition as a good in and of itself remains. *See*, e.g., *United States v. Anthem*, 855 F.3d 345, 435 (D.C. Cir. 2017) (Kavanaugh, J., dissenting, noting that merger analysis must balance market efficiencies with concerns over concentration). For example, the current DOJ/FTC Merger Guidelines view efficiencies as grounds to bless a merger only if they are unlikely to lead to a substantial lessening of competition. *Merger Guidelines*, Sec. 3.3, (2023).

Furthermore, low prices are but one factor in these "efficiencies." Then-Judge Kavanaugh's *Anthem* dissent noted that, beyond low prices, efficiencies include improved quality and new products. 855 F.3d at 435. Efficiencies in the New York groceries market include nearby stores, open at varying hours, with a variety of goods. Kaner Dec. ¶¶ 3, 19, 20, 22, 24, 52. The Program could force consumers to travel farther for groceries while reducing neighborhood shopping options, precisely the type of qualitative consumer harm antitrust law is designed to prevent. The Defendants have offered little analysis on the pro-competitive "efficiencies" allegedly created by diverting tax revenues to support a new entrant for a mature and competitive market.

Rather, the Defendants offer a single case analyzing government subsidies in an antitrust context: *Outboard Marine Corp. v. Pezetel*, 461 F. Supp. 384 (D. Del. 1978), a nearly fifty-year-old district court decision involving Poland's then-communist government. Wholly owned by the communist regime, the *Pezetel* defendant naturally enjoyed government subsidies. *Id.* However,

there is a crucial factual distinction between *Pezetel* and this case. There, the plaintiff missed a critical element for a predatory pricing claim by failing to allege sales below cost: "the low prices offered … are not alleged to be *below* Pezetel's costs or otherwise *predatory*." *Id.* at 404 (emphasis added). By contrast, the Plaintiffs have asserted and the Defendants have not disputed that the 30% discount is below cost.

Rather than the Defendants' Soviet Bloc analogy to *Pezetel*, the closer parallel, as noted in the Memorandum (at 17), is the Court's decision in *Union Pacific Railroad Co. v. United States*, 313 U.S. 450 (1941). *Union Pacific* shows the antitrust exposure governments face when using municipal advantages—free land, tax exemptions, cash payments, low rents—to compete in private markets. *Id.* at 442. Further, as set out in the Memorandum (at 14-18), government actors may neither "rough house" in a market (*Phoebe Putney*, 568 U.S. at 226) nor exploit unique benefits granted to advance "traditional government functions" and then unfairly compete in unrelated markets against disadvantaged businesses (*Jefferson County Pharmacy Ass'n v. Abbott Laboratories*, 460 U.S. 150, 153-54 (1983)).

**INTENT**

The Defendants argue that their intent is to address the City's affordability crisis, not create a monopoly. Opp. at 15. Even though the Program is designed to benefit New Yorkers from across the City[6] regardless of income[7] level, they present the Program as an effective means of addressing "the City's affordability crisis, and the concomitant problems of hunger and food insecurity." Opp. at 2.

---

[6] Declaration of Waverly Neer ("Neer Dec."), ECF No. 41, ¶ 23
[7] Declaration of Deandra Khan ("Khan Dec."), ECF No. 40, ¶ 15

The City's pursuit of the Program, despite more effective means of delivering targeted aid and the clear anticompetitive harm shown by Plaintiffs, demonstrates its true intent: eliminating competition in localized markets through taxpayer-supported below-cost pricing. *See Northeastern Tel. Co. v. American Tel. and Tel. Co.*, 651 F.2d 76, 85 (2d Cir. 1981) (holding that specific intent to monopolize can be inferred from a monopolist's actions).

The pleadings from the Defendants and Amici show a comprehensive system of targeted aid is already in place. This includes 700 food banks,[8] SNAP-linked programs such as Health Bucks, Get the Good Stuff, and Groceries to Go,[9] FRESH zoning & ASTEP tax assistance,[10] and partnerships with the Amici, the supporting non-profits,[11] and others. The FRESH and ASTEP programs in particular offer streamlined zoning and tax exemptions that demonstrate ready-made alternatives that are *targeted* and *pro-competitive*. Despite this, the Defendants boast of a $70 million[12] investment into a Program for which they have no experience even though the Amici lament that the City's "recently allocated $80 million" for food banks is "not enough to bridge the gap faced by New Yorkers." Amici Brief at 14.[13]

The Defendants' analogies to other municipalities' stores are inapposite. Plaintiffs do not challenge the Defendants running stores; this challenge is to their awarding themselves an unfair 30% discount. The Defendants have not suggested that any of these other municipalities offered tax-supported prices, and reporting on these stores shows no such practice. Lawson Dec. ¶ 5. Similarly, the DOD Commissary analogy is misplaced as it only serves "eligible military

---

[8] Opp. at 1.
[9] Declaration of Kimberly Kessler ("Kessler Dec."), ECF No. 38, ¶¶ 5, 6, 7
[10] Opp. at 6.
[11] Declaration of Siddhartha Sanchez ("Sanchez Dec."), ECF No. 42, Ex. 1-4.
[12] Declaration of Richard P. Lawson ("Lawson Dec."), ¶ 3
[13] "Amici Brief" refers to Brief of Amici Curiae The Community Service Society and Neighbors Together, ECF No. 36-1.

personnel." Sanchez Dec., ¶ 18. Far from a targeted effort to aid the needy, the Defendants' Program will serve all New Yorkers regardless of income level.

The City asserts that it "intends to locate the Stores in areas with low supermarket access" (Opp. at 7) but does not contradict Plaintiffs' assertions that City Fresh and the 27 food service operators near the Harlem location[14] as well as R&E and the 20 food service operators near the Bronx location[15] will see their livelihoods threatened.

The Defendants have made their anticompetitive intent plain.. Their Request for Proposal asserts that the Program is designed to "reduce costs in ways the private market alone cannot." Lawson Dec. ¶ 6. Sparing no criticism of competitive markets, Mayor Mamdani stated that when "corporations control every part of the food supply chain, prices go up… a public option allows us to intervene where the market has failed." Lawson Dec., ¶ 4. The true measure of the Defendants' intent is that the Program is far more likely to destroy the Plaintiffs' businesses than aid New York's neediest.

**THE DEFENDANTS' MARKET POWER**

The Defendants claim that Plaintiffs have failed to allege sufficient market share for monopoly power. Opp. at 17. This misreads Plaintiffs' pleadings. Market inquiries are fact-intensive determinations. *Brown Shoe*, 370 U.S. at 336-37 ("Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one."). The geographic and product markets were detailed in the Memorandum and firmly supported by Avi Kaner (Memorandum at 6-8; Kaner Dec ¶¶ 5-12). Notably, the Defendants have proffered no

---

[14] Kaner Dec. ¶ 31.
[15] Kaner Dec. ¶ 27.

expert to challenge the conclusions reached by Kaner, a 30-year veteran of the supermarket industry who focused on locating and developing grocery stores throughout New York City.

Kaner determined that the geographic market is at least ¾ of a mile from each location and that the product market consists of stores (such as Plaintiffs R&E and City Fresh) for whom a majority of sales fall within Core Basket items. Kaner Dec. ¶¶ 17, 22. Defendants claim that the product definition is ill-defined, but it is based *precisely* on the Core Basket list found in Appendix C of the RFP (stating, in pertinent part, that it "is a preliminary list of Core Basket Categories that Operator(s) *must* stock," Lawson Dec. ¶ 6, emphasis added).

Kaner concludes that stores offering those goods within ¾ of a mile of each location will be rendered "economically unviable" and will "materially reduce private grocery competition in the affected neighborhoods." Kaner Dec. ¶ 51. Within that ¾ mile, Defendants' market share will divert substantial sales from existing supermarkets and bodegas, rendering some unviable and materially reducing competition (Kaner Dec. ¶ 51). The Defendants' argument regarding barriers to entry fares no better. The subsidized discount itself functions as a barrier through which no competitor can find a viable path to solvency, much less profitability. Kaner Dec. ¶¶ 39, 40.

## LOCAL GOVERNMENT ACT IMMUNITY

The Defendants argue that the Local Government Antitrust Act of 1984 ("LGAA") protects any selected private operator. Opp. at 22-23. As a preliminary matter, the LGAA does nothing to prevent potential criminal exposure, nor does it prevent civil injunctive relief. For example, the selected operator will, at the very least, become a material witness in the present action. More importantly, antitrust conspiracies are condemned at the outset as they deprive the market of "independent centers of decision making that competition assumes and demands," *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767–69 (1984). Once selected, the private

operator ceases the independent pro-competitive decision-making demanded by antitrust law and immediately becomes a co-conspirator. *See United States v. American Airlines, Inc.*, 743 F.2d 1114 (5th Cir. 1984) (antitrust conspiracy forms at moment of acceptance).

**IMMEDIATE AND IRREPARABLE HARM**

The Defendants rely on *L&M Bus Corp. v. Board of Education of the City School District of New York*, 2018 WL 2390125 (E.D.N.Y. May 25, 2018), to suggest that a private operator's risks of first being selected and then being sued are too speculative to support a preliminary injunction. Opp. at 24. However, *L&M* carefully explained that the danger of a winning bidder facing lawsuits necessitating withdrawal from that public contract or collateral labor disputes did not create "imminent legal liability." *Id.* *5. Here, the legal liability is *immediate* upon selection.

The City's representations at the September 17 hearing may have mooted bidders' prior dilemma (submit and risk liability, or miss a business opportunity[16]), but damages[17] cannot compensate for the irreparable harm of joining an unlawful conspiracy. Separately, selection means the challenged agreement comes into existence, implementation begins. Reliance interests begin forming, resources are committed, and the practical difficulty of unwinding the Program increases substantially. Local businesses would undertake plans to defer renovations, delay technology improvements, seek rent concessions, or simply cease operations. Kaner Dec. ¶¶ 49, 50.

[16] As noted in the accompanying Declaration of Anthony Pena, at least one member of Plaintiff NSA, Palero Corp., submitted a response to the RFP.

[17] As any "damages" owed to a selected operator would be paid by the Defendants, their interest in avoiding liability should be at least as great as any bidders'. *See* Memorandum at 23-26; *Glenwood Bridge, Inc., v. City of Minneapolis*, 940 F.2d 367, 372 (8th Cir. 1991) (noting a "public interest in ensuring a lawful bidding process.")

## THE BALANCE OF HARDSHIPS

Noting that lower income New Yorkers spend up to 25% of their income on groceries (from an overall Citywide average of 6%), the Defendants argue that an injunction will deny them the ability to provide affordable groceries. Opp. at 26. As demonstrated through the City's comprehensive aid structure detailed in their *own* pleadings, this preliminary injunction will in no way affect the City's efforts to care for its neediest residents.

All the requested relief does is maintain the status quo by delaying selection until legality has been determined on the merits. *Bronx Household of Faith v. Board of Educ. of City of New York*, 331 F.3d 342, 349 (2d Cir. 2003) (noting that a "higher standard of proof comes into play when the injunction sought will alter rather than maintain the status quo."). A preliminary injunction will in no way affect the City's efforts to aid New Yorkers who spend up to 25% of their income on food. Moreover, the Plaintiffs do not seek an intrusive and difficult-to-enforce injunction compelling the Defendants to cease development efforts for the Program. For example, this injunction would not have prevented the Defendants' recent selection of a marketer[18] for the Program. While such efforts might support Count I's attempted monopolization claim, that is a matter for the merits, not preliminary relief. Lastly, a delayed selection of the private operator until a merits determination will have little to no impact on the Defendants' goal of opening five stores by 2029. Opp. at 2.

## CONCLUSION

The Program's tax-supported 30% discount upends the Nation's commitment to free markets. The Program will devastate competition in the neighborhoods where these stores are located, with every penny of "savings" for nearby residents paid for by taxpayers citywide. As

[18] Lawson Dec. ¶ 7.

"the policy unequivocally laid down by the Act is competition," *Northern Pacific Railway Co.*, 356 U.S. at 4 (1958), there is no justification for these tax-supported low prices destroying competition. Plaintiffs therefore respectfully request the Court grant the preliminary injunction.

Dated: October 23, 2026

By: */S/ Richard P. Lawson*
Richard P. Lawson
AMERICA FIRST POLICY INSTITUTE
1455 Pennsylvania Ave., N.W., Suite 225
Washington, D.C. 20004
Telephone: 703-637-3690
rlawson@americafirstpolicy.com

- and -

By: */S/ Eric R. Levine*
Eric R. Levine
Eric P. Heichel
EISEMAN LEVINE LEHRHAUPT
& KAKOYIANNIS, P.C.
805 Third Avenue, 10th Floor
New York, New York 10022
Telephone: 212-752-1000
elevine@eisemanlevine.com
eheichel@eisemanlevine.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), I hereby certify that this memorandum of law complies with the applicable word-count limitation. The memorandum contains 3,397 words, excluding the caption, table of contents, table of authorities, signature block, and this certificate.

*/s/ Richard P. Lawson*
Richard P. Lawson