UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL SUPERMARKET ASSOCIATION, R&E CORPORATION, AND THE REAL CHANCE, INC.,

Plaintiffs,

-against-

THE CITY OF NEW YORK and THE NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION,

Defendants.

Case No. 1:26-cv-07729 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

This case concerns whether New York City's new discounted groceries initiative, N.Y.C. Groceries, runs afoul of federal antitrust law.

Plaintiffs National Supermarket Association ("NSA"), R&E Corporation ("R&E"), and the Real Chance, Inc. ("Real Chance"; together, "Plaintiffs") bring this action against the City of New York (the "City") and the New York City Economic Development Corporation ("NYCEDC; City and NYCEDC together "Defendants"). Plaintiffs contend that Defendants' proposed N.Y.C. Groceries initiative violates the Sherman Antitrust Act, 15 U.S.C. § 2. Before the Court is Plaintiffs' amended motion for a preliminary injunction barring the selection of private operators seeking to operate grocery stores associated with N.Y.C. Groceries (the "Stores"). Dkt. 28.

For the following reasons, Plaintiffs' motion for a preliminary injunction is DENIED.

## BACKGROUND

### I. Relevant Facts

The following facts are drawn from the parties' evidentiary submissions. Dkt. 9 ("Lawson Decl."), Dkt. 10 ("R. Nunez Decl."), Dkt. 11 ("J. Nunez Decl."), Dkt. 12 ("Pena Decl."), Dkt. 13 ("Kaner Decl."), Dkt. 38 ("Kessler Decl."), Dkt. 39 ("Dalton Decl."), Dkt. 40 ("Khan Decl."), Dkt. 41 ("Neer Decl."), Dkt 42 ("Sanchez Decl."), Dkt. 45 ("Pena Supp. Decl."), and Dkt. 46 ("Lawson Supp. Decl.").

On July 27, 2026, Defendants announced N.Y.C. Groceries. *See* Dkt. 9-6 ("Press Release"). In public statements accompanying the launch and affidavits submitted to the Court, Defendants identified that (1) grocery prices in the metropolitan New York area have risen 30% since 2019, Dkt. 9-5 ("Recipe for Affordability") at 4; Kessler Decl. ¶ 12, (2) approximately 15% of New York City residents experience food insecurity, Recipe for Affordability at 4; Khan Decl. ¶ 7, and (3) almost 80% "report concern about rising food prices," Recipe for Affordability at 4; Khan Decl. ¶ 4. Defendants currently support several programs to promote food access for New Yorkers, including those that subsidize the purchase of healthy foods for consumers, Kessler Decl. ¶¶ 4-7, as well as those like Food Retail Expansion to Support Health ("FRESH"), which "provides zoning and financial incentives to encourage the development and retention of full-service grocery stores in historically underserved neighborhoods," Sanchez Decl. ¶¶ 8-11; *see also* Khan Decl. ¶ 20, and public food markets like Essex Market, "which give small vendors space at below-market rent to sell their goods," Khan Decl. ¶ 20.

According to Defendants, N.Y.C. Groceries would operate alongside those programs to "guarantee lower prices for New Yorkers," Dkt. 9-1; *see also* Sanchez ¶ 15; Neer ¶ 14, by establishing five Stores — one in each New York City borough — offering a 30% discount on a "core basket of goods that will include fresh produce, meat, fish, seafood, plant-based proteins,

pantry staples, and other nutritious foods" (the "Core Basket Goods"),[1] Recipe for Affordability at 8; *see also* Neer Decl. ¶ 4. Although "private operators will manage" each Store, Defendants "will select [S]tore sites, fund initial construction, provide operating subsidies, and set pricing and operating standards." Neer Decl. ¶ 5. Defendants will also "waive real estate and property taxes" for those private operators. Khan Decl. ¶ 10. As of July 2026, Defendants have allocated $70 million in funding to N.Y.C. Groceries. *See* Press Release at 4.

The Stores will open in "priority neighborhoods facing the greatest challenges with grocery affordability and access." Press Release at 6. Two sites have already been selected: one at Hunts Point in the Bronx — where "77% of households in surrounding neighborhoods struggle to afford basic necessities," Dkt. 9-4 at 4 — and the other in East Harlem, Manhattan, Press Release at 4, 7. Those Stores are targeted to open in 2027 and 2029, respectively. Neer Decl. ¶ 8. Locations in Brooklyn, Queens, and Staten Island have yet to be chosen. *Id.*

The same day N.Y.C. Groceries was announced, Defendants publicly released a Request for Proposals to private operators seeking to manage the Stores. Dkt. 9-2 ("RFP") at 5. The RFP explicitly requires operators set prices on the Core Basket Goods at "an average discount of 30% relative to the retail price" at other stores in New York City and requires they charge prices comparable to "typical retail prices" for other products. RFP at 13-14; Neer Decl. ¶ 37. The RFP states N.Y.C. Groceries aims to "reduc[e] prices in ways the private market alone cannot" and "offer a model for future programs." RFP at 4-5; *see also* Recipe for Affordability at 4 (calling N.Y.C. Groceries "government action to directly reduce prices and improve access in ways the private market alone cannot"). The RFP details submission requirements for prospective private operators as well as criteria Defendants will rely upon to make their

[1] Defendants have yet to determine the precise items included among the Core Basket Goods and instead describe only "anticipated" items. *See* Khan Decl. ¶ 10; Neer Decl. ¶ 4.

selections. RFP at 16-23. The RFP states "a preference for proposals to operate all five (5) sites." RFP at 22. Submissions were due by October 16, 2026. RFP at 5.

Plaintiffs are — or advocate on behalf of — privately operated grocers located near the proposed Stores in the Bronx and Manhattan. *See* Pena Decl. ¶¶ 5-6, 12, 19, 22; J. Nunez Decl. ¶¶ 2, 21; R. Nunez Decl. ¶¶ 2, 21. Plaintiff NSA represents over 150 members who manage over 400 supermarkets in New York City, some of which are within walking distance to the proposed Stores in the Bronx and Manhattan. *See* Pena Decl. ¶¶ 6, 12. For the average NSA member, "well over 50% of average weekly sales" is derived from selling Core Basket Goods. Pena Decl. ¶ 11; *see also* Kaner Decl. ¶ 17. Plaintiff R&E is a supermarket located half a mile from the proposed Bronx Store and derives 60% of its total sales from selling Core Basket Goods. *See* R. Nunez Decl. ¶¶ 11-12, 14; *see also* Kaner Decl. ¶ 18. Likewise, Plaintiff Real Chance owns and operates City Fresh Supermarket ("City Fresh"), which is within walking distance of the proposed Manhattan Store and also makes 60% of its total sales from selling Core Basket Goods. *See* J. Nunez Decl. ¶¶ 2, 12, 14.

At least two of these private operators have either responded, or expressed interest in responding, to the RFP. One store, nonparty Palero Food which is a member of NSA, operates in the Bronx and submitted a response to the RFP on or before the October 16, 2026 deadline. *See* Pena Supp. Decl. ¶¶ 3-4. City Fresh has also explored submitting a bid, Pena Decl. ¶ 19 ("City Fresh [is] willing to run multiple locations[.]"), but "refrain[ed] from submitting a proposal" out of concern that Defendants' acceptance of its proposal would expose it to antitrust liability under Section 2 of the Sherman Act, *id.* ¶ 22.

## II. Procedural History

Plaintiffs initiated this action on September 9, 2026, Dkt. 1 ("Complaint" or "Compl."). In short, Plaintiffs contend the 30% discount set by N.Y.C. Groceries is a "predatory pricing

scheme prohibited" under federal antitrust law. *Id.* ¶ 13. Accordingly, Plaintiffs allege the RFP's solicitation of bids from private operators constitutes attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, and the acceptance of any proposal would create a conspiracy to monopolize in violation of the same statute. *Id.* ¶¶ 106-130. The Complaint requests that the Court (1) permanently enjoin Defendants under 15 U.S.C. § 26 from implementing N.Y.C. Groceries, and (2) enter a declaratory judgment under 28 U.S.C. § 2201(a) stating "that an accepted offer submitted in response to the RFP constitutes an agreement that violates Section 2 of the Sherman Act." *Id.* ¶¶ 116, 123, 128.

The same day the Complaint was filed, Plaintiffs moved for a preliminary injunction. Dkt. 8. On September 22, 2026, Plaintiffs filed an amended motion for a preliminary injunction, Dkt. 28, and an accompanying memorandum of law, Dkt. 29 ("Mot."). In it, Plaintiffs asked the Court to enter a preliminary injunction "prohibiting the award or denial of applications to become the private operator(s) of the N.Y.C. Groceries program until after a ruling on the merits." Mot. at 2. On October 9, 2026, Defendants filed a memorandum of law in opposition. Dkt. 37 ("Opp."). On October 23, 2026, Plaintiffs filed a reply. Dkt. 44 ("Reply"). The Court also accepted an amicus brief filed by Community Service Society and Neighbors Together in support of Defendants. Dkt. 34-35. An initial conference was held on September 17, 2026, *see* Hearing Transcript ("Sep. Tr."), and a preliminary injunction hearing was held on November 12, 2026, *see* Hearing Transcript ("Nov. Tr.").

## LEGAL STANDARD

"[T]he preliminary injunction 'is one of the most drastic tools in the arsenal of judicial remedies,'" *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quoting *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985)), and "[t]he district court has wide discretion in determining whether to grant a preliminary injunction," *Moore v.*

*Consol. Edison Co. of New York*, 409 F.3d 506, 511 (2d Cir. 2005). "A party seeking a preliminary injunction must demonstrate: (1) 'a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) a likelihood of 'irreparable injury in the absence of an injunction'; (3) that 'the balance of hardships tips in the plaintiff's favor'; and (4) that the 'public interest would not be disserved' by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (omission in original) (quoting *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010)). The latter two "factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *accord Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211, 224 (2d Cir. 2021) (citation omitted). To attain such "an extraordinary and drastic remedy," the movant must "carr[y] the burden of persuasion" "by a clear showing." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024) (quoting *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005)). "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) (quoting *Johnson v. Newport Lorillard*, No. 01-cv-09587 (SAS), 2003 WL 169797, at *1 (S.D.N.Y. Jan. 23, 2003))).

## DISCUSSION

Plaintiffs seek a preliminary injunction that prohibits Defendants from selecting private operators to run the Stores until the Court decides the merits of their claims for attempted monopolization and conspiracy to monopolize. *See* Mot. at 2, 27. For the following reasons, the Court finds that Plaintiffs have failed to meet their burden for an injunction.

## I. Merits

### A. Standard

As discussed above, parties seeking a preliminary injunction generally must establish "either [1] a likelihood of success on the merits or [2] 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Am. C.L. Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015) (citation omitted). "To establish a likelihood of success on the merits, a plaintiff 'need not show that success is an absolute certainty. [It] need only make a showing that the probability of . . . prevailing is better than fifty percent.'" *New York by James v. Rescue*, 705 F. Supp. 3d 104, 122 (S.D.N.Y. 2023) (alteration and omission in original) (quoting *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018)).

Likewise, "[t]he 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). To succeed under this standard, the plaintiff must raise "questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *State Farm*, 120 F.4th at 83 (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)). Notably, the likelihood of success standard is "more rigorous" than the "serious questions" standard. *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (citation omitted); *Trump v. Deutsche Bank AG*, 943 F.3d 627, 637 n.22 (2d Cir. 2019) ("[T]here can be no doubt, as we have repeatedly said, that the likelihood-of-success standard is more rigorous than the serious-questions standard[.]"), *vacated*

*and remanded sub nom. on other grounds Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020); *Cent. Rabbinical Cong. of U.S. & Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183 (2d Cir. 2014) (citation omitted).

Although a plaintiff may normally rely on either standard in requesting a preliminary injunction, "where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," a plaintiff can only succeed by showing a likelihood of success on the merits. *Plaza Health Lab'ys, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989). "This exception reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995). Here, while Plaintiffs seek to enjoin government action, they contend the more demanding likelihood of success standard is not required because "no New York statutory or constitutional provision authorizes the N.Y.C. Groceries plan." Mot. at 9. Defendants insist that Plaintiffs must show likelihood of success on the merits because N.Y.C. Groceries was enacted pursuant to Defendants' general authority to address the well-being of its residents, *see* N.Y. Const. art. IX, § 2(c)(10); N.Y. Mun. Home Rule Law § 10(1)(ii)(a)(12), as well as the Mayor's Office of Food Policy prerogative to, among other things, "[s]upport initiatives that are designed to promote access to healthy food," N.Y. City Charter § 20-i. *See* Opp. at 9.

The Court need not determine which standard should apply here because, for the reasons that follow, Plaintiffs' claims fail under either approach. *See Prospect Park Ass'n v. Delaney*, No. 18-cv-4852 (NSR), 2018 WL 3542860, at *3 (S.D.N.Y. July 23, 2018) (recognizing that although "the more stringent preliminary injunction standard likely applies to the present action[,] . . . the Court need not linger on the issue" because "[p]laintiff has failed to demonstrate

even a 'sufficiently serious question going to the merits' of the present action."); *see also Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New York*, 700 F. Supp. 3d 86, 97 (S.D.N.Y. 2023) (concluding plaintiff in suit against government was required to demonstrate likelihood of success on the merits, but "[i]n any event, . . . the plaintiff has also failed to show a serious question on the merits").

**B. Analysis**

Under Section 2 of the Sherman Act, a party may not "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. Plaintiffs allege attempted monopolization and conspiracy to monopolize under Section 2. Compl. ¶¶ 106-130. To prove attempted monopolization, a plaintiff "must establish '(1) that [defendant] has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 266 (2d Cir. 2001) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). "Proof of the first element of an attempted monopolization claim, anticompetitive or exclusionary conduct, may be used to infer the second element, specific intent to monopolize; and when coupled with proof of monopoly power, evidence of anticompetitive conduct may demonstrate a dangerous probability of success." *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988). To prove conspiracy to monopolize, a plaintiff must establish "(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 233 (2d Cir. 1999) (citation omitted); *accord In re Inclusive Access Course Materials Antitrust Litig.*, 544 F. Supp. 3d 420, 439 (S.D.N.Y. 2021).

*1. Predatory Pricing Framework*

Plaintiffs argue their theory of predatory pricing — i.e. the 30% discount on Core Basket Goods — is "[c]ommon to both the attempt and conspiracy claims." Mot. at 10; *see also* Opp. at 10. "Predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 117 (1986). Predatory pricing occurs in three stages:

> First, a seller temporarily cuts his price with the intent of eliminating his competitors or deterring potential competitors from entering the market. Second, the damage to or discouragement of competitors enables the predator to create or maintain a monopoly. Third, the predator recoups revenues lost through the temporary price cut by charging higher, monopoly prices.

*Irvin Indus., Inc. v. Goodyear Aerospace Corp.*, 974 F.2d 241, 244 (2d Cir. 1992).

In *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), the Supreme Court established the method by which courts evaluate predatory pricing claims. The Court recognized as a general matter the "antitrust laws' traditional concern for consumer welfare and price competition," *id.* at 221, and noted "the mechanism by which a firm engages in predatory pricing — lowering prices — is the same mechanism by which a firm stimulates competition; because cutting prices in order to increase business often is the very essence of competition," such that "mistaken inferences are especially costly, because they chill the very conduct the antitrust laws are designed to protect," *id.* at 226 (citation modified). Thus, the Court made clear that "predatory pricing schemes are rarely tried, and even more rarely successful." *Id.* at 226 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 589 (1986)); *see also Virgin Atl.*, 257 F.3d at 266 ("[T]he Supreme Court has expressed deep skepticism regarding the viability of proving a predatory pricing scheme.").

Accordingly, the Court set forth "two prerequisites to recovery" that "are not easy to establish." *Brooke Grp.*, 509 U.S. at 226; *see also Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 318 (2007) ("[*Brooke Group*] established two prerequisites to recovery on claims of predatory pricing").[2] First, the defendant must set prices "below an appropriate measure of its rival's costs." *Brooke Grp.*, 509 U.S. at 222. The Second Circuit has determined that prices set below rival firms' "average variable cost" satisfy this requirement. *See Ne. Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 88 (2d Cir. 1981) ("[P]rices below reasonably anticipated marginal cost will be presumed predatory, while prices above reasonably anticipated marginal cost will be presumed non-predatory. . . . [B]ecause marginal cost cannot be determined from conventional accounting methods, we will use average variable cost as its surrogate." (footnote and citation omitted)); *accord Valassis Commc'ns, Inc. v. News Corp.*, No. 17-cv-7378 (PKC), 2019 WL 802093, at *7 & n.7 (S.D.N.Y. Feb. 21, 2019) (applying average variable cost standard to first prerequisite of predatory pricing claim).

Second, the plaintiff must show the defendant has "a dangerous probability . . . of recouping its investment in below-cost prices." *Brooke Grp.*, 509 U.S. at 224. In so holding, the Court emphasized the centrality of recoupment to a predatory pricing claim: "Recoupment is the ultimate object of an unlawful predatory pricing scheme; it is the means by which a predator profits from predation. Without it, predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced." *Id.*; *see also Weyerhaeuser*, 549 U.S. at 319 ("[W]ithout a dangerous probability of recoupment, it is highly unlikely that a firm would engage in predatory pricing."). The Second Circuit has repeatedly recognized the same. *See*

[2] Although the dispute at issue in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.* involved a Robinson-Patman Act claim, the Court made clear that these prerequisites also apply to claims brought under Section 2 of the Sherman Act. *See* 509 U.S. 209, 222 (1993).

*United States v. Apple, Inc.*, 791 F.3d 290, 332 (2d Cir. 2015) ("Because lower prices improve consumer welfare (all else being equal), below-cost pricing is unlawfully anticompetitive only if there is a 'dangerous probability' that the firm engaging in it will later recoup its losses by raising prices to monopoly levels after driving its rivals out of the market."); *Virgin Atl.*, 257 F.3d at 272 ("Without proof of recoupment, predatory pricing produces lower aggregate prices benefitting consumers.").

Thus, a plaintiff unable to satisfy both prerequisites cannot succeed on a predatory pricing claim brought as either an attempted monopolization claim, *see Virgin Atl.*, 257 F.3d at 266, or a claim for conspiracy to monopolize, *cf. AD/SAT*, 181 F.3d at 235 ("Allegedly anticompetitive conduct must be considered in its factual context. Where that context reveals that the conspiracy claim is one 'that simply makes no economic sense — [the plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary.'" (quoting *Matsushita*, 475 U.S. at 587)).

Courts take varying approaches in analyzing predatory pricing claims in the context of attempted monopolization, the elements of which are (1) anticompetitive conduct, (2) specific intent, and (3) a dangerous probability of monopolization. Some courts consider the failure to establish the two predatory pricing prerequisites as sufficient to defeat an attempted monopolization claim, but do not address how those prerequisites relate to the elements of attempted monopolization. *See, e.g.*, *Virgin Atl.*, 257 F.3d at 266-72 (analyzing predatory pricing prerequisites without situating them within the three elements of an attempted monopolization claim); *City of New York v. Coastal Oil New York, Inc.*, No. 96-cv-8667 (RPP),

1998 WL 82927, at *4-5 (S.D.N.Y. Feb. 25, 1998) (same).[3] Other courts recognize that the two prerequisites together establish the anticompetitive conduct element of attempted monopolization and then separately address specific intent and the dangerous probability of achieving monopoly power. *See, e.g.*, *SlackPass, Inc. v. Frosted, Inc.*, No. 23-cv-06393 (ER), 2025 WL 1004854, at *12 (S.D.N.Y. Mar. 31, 2025) ("To establish anticompetitive conduct through predatory pricing pursuant to Section 2 of the Sherman Act, the plaintiff must show that 'the defendant lowered its prices below an appropriate measure of its . . . costs' in circumstances where there exists 'a dangerous probability' that the defendant will recoup later." (citation modified)); *MiniFrame Ltd. v. Microsoft Corp.*, No. 11-cv-7419 (RJS), 2013 WL 1385704, at *3, *5-6 (S.D.N.Y. Mar. 28, 2013), *aff'd*, 551 F. App'x 1 (2d Cir. 2013).

The Court need not articulate here the precise relationship between the two predatory pricing prerequisites and the elements of attempted monopolization and conspiracy to monopolize. As will be explained below, Plaintiffs' claims falter with respect to the recoupment prerequisite that is common to both claims. *See* Mot. at 10. In the alternative, even if attempt and conspiracy are evaluated independently under their respective elements, Plaintiffs cannot succeed in showing Defendants' specific intent to monopolize. *See Virgin Atl.*, 257 F.3d at 266 (recognizing specific intent to monopolize as element of attempted monopolization claims); *AD/SAT*, 181 F.3d at 233 (observing the same as to conspiracy claims).

2. *Application*

To recap, there are two prerequisites for a predatory pricing claim: "(1) 'that the prices complained of are below an appropriate measure of its rival's costs,' and (2) that the predatory

[3] *See also* Dustin Sharpes, *Reintroducing Intent into Predatory Pricing Law*, 61 Emory L. J. 903, 930 (2012) (observing that courts "consistently speak of *Brooke Group*'s prerequisites as the only two elements of a predatory pricing claim").

rival has a 'dangerous probability' of recouping its investment through a below cost pricing scheme." *Virgin Atl.*, 257 F.3d at 266 (quoting *Brooke Grp.*, 509 U.S. at 224).

As to the first prerequisite, the Court assumes — without deciding — that Plaintiffs are likely to succeed in showing that the 30% discount on Core Basket Goods set by N.Y.C. Groceries will impose prices below other retailers' average variable costs. *See* Kaner Decl. ¶¶ 35-37 (determining N.Y.C. Groceries "creates a structural cost advantage that private operators — who must recover rent, taxes, and a normal return on capital from sales — cannot match"); R. Nunez Decl. ¶ 20; *see also Ne. Tel. Co.*, 651 F.2d at 88.[4]

The heart of the dispute, however, lies in Plaintiffs' ability to meet the second prerequisite: a dangerous probability of recoupment. Plaintiffs cannot make that showing here. N.Y.C. Groceries requires that the Stores maintain the 30% discount prices on Core Basket Goods and mandates they charge prices comparable to "typical retail prices" for other products. RFP at 13-14; Neer Decl. ¶ 37. Indeed, during the preliminary injunction hearing, Plaintiffs conceded that there is no basis to find that Defendants will disregard the programmatic 30% discount and later engage in supracompetitive pricing to recoup their losses. *See* Nov. Tr. 22:21-23:8 (agreeing that the program entails a "permanent 30 percent discount or those core items"). Plaintiffs point to Defendants' statements that the program is "reducing prices in ways the private market alone cannot" and is "a model for future programs" as evidence of Defendants' intent to monopolize and eliminate private competitors. *See* RFP at 4-5; *see also* Mot. at 4, 20. But these errant statements do not suggest that Defendants intend to eliminate competition and raise prices of either Core Basket Goods or other goods later. *See Ne. Tel. Co.*, 651 F.2d at 85

[4] Because the Court assumes without deciding that Defendants are setting prices below rivals' costs, it need not address Plaintiffs' argument that the average total cost should be evaluated rather than average variable cost. *See* Mot. at 12.

("The crucial question is whether appellants specifically intended to vanquish their opposition by unfair or unreasonable means."); *see also* Khan Decl. ¶ 19 (stating that stores affiliated with N.Y.C. Groceries "are intended to complement" privately run stores, "not to replace them"). Indeed, Defendants will continue operating programs like FRESH that support other private grocery stores through, among other things, "tax and land use breaks." Khan Decl. ¶ 20; *see also* Sanchez Decl. ¶¶ 8-15. Given Defendants' lack of a profit incentive, *see* Khan Decl. ¶ 27 (confirming Defendants have "no profit motive"); Recipe for Affordability at 6, and the lack of any evidence that the Stores will be permitted to raise prices to a supracompetitive level in the future given the structure of N.Y.C Groceries, the Court concludes that Plaintiffs have not shown a "dangerous probability" of recoupment. *See City of Long Beach v. Total Gas & Power N. Am., Inc.*, No. 20-2020-cv, 2021 WL 5754295, at *1 (2d Cir. Dec. 3, 2021) (summary order) ("To demonstrate the sort of predatory pricing prohibited under Section 2, a plaintiff must plead that the defendant manipulated prices with the goal of eliminating its competitors from the market and that its actions were intended to be exclusionary.").

Seemingly recognizing the weakness of its position, Plaintiffs urge the Court to set aside the recoupment prerequisite in this "unique" situation where "a municipal retail entrant that has no need to recoup losses from later monopoly profits because losses are absorbed indefinitely by the tax base." Mot. at 13; *see also id.* at 13-20. They argue that "[t]raditional antitrust concerns about rational private actors, the speculative nature of recoupment, and the risk of chilling legitimate price competition simply do not apply when the predator is funded by compulsory taxation." *Id.* at 13. Defendants argue that "Plaintiffs offer no authority supporting their position, and instead simply argue that because N.Y.C. Groceries is a government-supported program, the Court should disregard the recoupment requirement, against decades of precedent." Opp. at 13. The Court declines to adopt Plaintiffs' novel approach.

As explained above, the Supreme Court and Second Circuit have made clear that recoupment is at the crux of a predatory pricing claim. *See Brooke Grp.*, 509 U.S. at 224; *Weyerhaeuser*, 549 U.S. at 318-19; *Apple, Inc.*, 791 F.3d at 332; *Virgin Atl.*, 257 F.3d at 272; *see also* Areeda & Hovenkamp ¶ 726 ("[T]here can be no predatory pricing with harm to consumers if recoupment is not even a part of the strategy."). Plaintiffs insist that while recoupment may be required in cases involving private actors, the concerns animating this prerequisite do not apply to a government actor. *See* Mot. at 18-20. Specifically, Plaintiffs argue (1) Defendants are not rational, profit-seeking enterprises and rather will "shift of long-run losses to the City's tax base" such that there is no need to raise prices to recoup any loss, and (2) the recoupment prerequisite exists to avoid chilling price competition that benefits consumers, yet N.Y.C. Groceries is not promoting price competition but rather "dump[ing] tax dollars into the industry." *Id.*

These arguments are unavailing. Without a recoupment prerequisite, Plaintiffs effectively seek to flatten predatory pricing claims to impose liability if a government actor intervenes in a private market resulting in prices below average variable cost. Such a rule would undermine the federal antitrust laws that exist to promote consumer welfare. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, (1984) ("Congress designed the Sherman Act as a 'consumer welfare prescription.'" (citation omitted)); *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 128 F.3d 59, 63 (2d Cir. 1997) (identifying the "Sherman Act's essential purpose: safeguarding consumer welfare."). The Court recognizes that this welfare principle is often discussed in the context of lower prices brought about via increased competition and the lower prices here are not a result of such competitive forces. *See, e.g.*, *Virgin Atl.*, 257 F.3d at 269 ("We must be mindful that low prices are a positive aspect of a competitive marketplace and are encouraged by the antitrust laws."). That said, the Court declines to interpret the Sherman Act as condemning conduct that brings about lower

prices without a demonstrable harm to competition that disserves consumers. *See Brooke Grp.*, 509 U.S. at 226-27 ("It would be ironic indeed if the standards for predatory pricing liability were so low that antitrust suits themselves became a tool for keeping prices high."); *Virgin Atl.*, 257 F.3d at 272 ("Without proof of recoupment, predatory pricing produces lower aggregate prices benefitting consumers."). Indeed, Plaintiffs' expansive interpretation of the Sherman Act would sweep in many government programs that promote lower prices, for example policies at Essex Market that "give small vendors space at below-market rent to sell their goods." Khan Decl. ¶ 20.

Of course, government actors may not act unlawfully in the markets. *See F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 231 (2013) (observing when a government participates in a market, it may not "roughhouse in that market unlawfully" (citation omitted)). But Plaintiffs have not pointed to any precedent justifying a different application of the Sherman Act's predatory pricing rubric to government actors; rather, the cases upon which they rely are inapposite.

In *Jefferson County Pharmaceutical. Association, Inc. v. Abbott Laboratories*, 460 U.S. 150 (1983), for example, the Supreme Court concluded that a government's "sale of pharmaceutical products to state and local government hospitals for resale in competition with private pharmacies [wa]s not exempt" from antitrust liability under the Robinson-Patman Act. *Id.* at 171. Plaintiffs invoke that case to suggest Defendants may be liable under the antitrust laws even though they are government actors, *see* Mot. at 18, a general premise with which this Court takes no issue. However, *Jefferson County* only addressed the application of state antitrust immunity and did not hold that the government conduct violated antitrust law. *See* 460 U.S. at 153-57. Defendants are not asserting any such immunity. They simply argue their conduct does

not constitute a federal Sherman Act claim for predatory pricing under *Brooke Group*. *See* Opp. at 10.

Likewise, *Union Pacific Railroad Co. v. United States*, 313 U.S. 450 (1941) does not bear the weight Plaintiffs want it to hold. *See* Mot. at 17-18. In that case, a railroad company sought to gain an advantage over its competitors by diverting rail traffic from Missouri to Kansas, where it had far greater control of the market. *Id.* at 452-54, 461. To do so, the railroad convinced a Kansas municipality to build a new rail terminal in which the municipality offered vendors "free rents, reduced rents, free refrigeration, cash payments and rental credits" with the goal of luring them from Missouri to Kansas. *Id.* at 458. The Court concluded the municipality's conduct violated the Elkins Act, a federal law "which prohibit[s] rebates, concessions and discriminations in respect to the transportation of property by railroad in interstate commerce." *Id.* at 452-53, 471; *see also Armour Packing Co. v. United States*, 209 U.S. 56, 72 (1908) ("The Elkins [A]ct proceeded upon broad lines and was evidently intended to effectuate the purpose of Congress to require that all shippers should be treated alike, and that the only rate charged to any shipper for the same service, under the same conditions, should be the one established, published, and posted as required by law."). The Supreme Court emphasized that the "promotion of civic advancement may not be used as a cloak to screen the granting of discriminatory advantages to shippers." *Id.* at 465.

Plaintiffs argue that *Union Pacific Railroad Co*. teaches that N.Y.C. Groceries' laudable goals of addressing food insecurity in New York City does not shield it from antitrust liability. *See* Nov. Tr. at 17:13-18. No one disputes this notion. However, just as in *Union Pacific* where the Court concluded the Kansas municipality violated the Elkins Act under the standards applicable to any actor, *see* 313 U.S. at 470-71 ("Where, as here, the action of the [Kansas municipality] in giving cash and rental credits is, as we have decided, a part of a plan in respect

to transportation resulting in an advantage to shippers, we conclude that the giving of any cash, rental credit, free or reduced rents to induce leasing of space in the Terminal is contrary to the Elkins Act."), it follows that Plaintiffs must establish Defendants violated the Sherman Act under the predatory pricing requirements applicable to any actor as set forth in *Brooke Group*. *Union Pacific* does not support the argument that the Sherman Act is applied differently in the context of a government actor.

Thus, there is no justification for setting aside the critical prerequisite for predatory pricing: a dangerous probability of recoupment. And, as discussed, Plaintiffs have not satisfied that prerequisite. For the same reasons and to the extent it is independently necessary, the Court also finds Plaintiffs are unable to show Defendants possessed a specific intent to monopolize. This is fatal to both claims. *See Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 101 (2d Cir. 1998) ("[S]pecific intent to destroy competition or build monopoly is essential" to an attempted monopolization claim (citation omitted)); *Ne. Tel. Co.*, 651 F.2d at 85 ("The crucial question [in conspiracy to monopolize cases] is whether appellants specifically intended to vanquish their opposition by unfair or unreasonable means.").

* * *

In sum, Plaintiffs have failed to meet their burden on the merits under either standard for a preliminary injunction. Because they cannot establish the "dangerous probability of recoupment" prerequisite in a predatory pricing claim, they are not likely to succeed on the merits of their attempted monopolization or conspiracy claims. Given that Plaintiffs' claims are clearly foreclosed by established and binding precedent, there are also no questions that are "so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation," *State Farm*, 120 F.4th at 83 (quoting *Hamilton Watch*, 206 F.2d at 740), or, as discussed below, a balance of hardships tipping decidedly in Plaintiffs' favor.

## II. Balance of Hardships and the Public Interest

In assessing a motion for a preliminary injunction, a court must consider whether "the balance of hardships tips in the plaintiff's favor" as well as whether the "public interest would not be disserved by the issuance of an injunction." *Benihana, Inc.*, 784 F.3d at 895 (citation modified). As noted above, "[t]hese factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435; *accord Hartford Courant*, 986 F.3d at 224. Accordingly, a court weighs together "'the competing claims of injury . . . the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary remedy of injunction.'" *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 402 (S.D.N.Y. 2023) (citation omitted); *see also Seventh Regiment Armory Conservancy, Inc. v. Knight*, 811 F. Supp. 3d 467, 487 (S.D.N.Y. 2025) (assessing factors "in tandem").

Plaintiffs argue that the enforcement of antitrust laws serves the public interest and a "short delay" in selecting private operators presents minimal harm to Defendants. Mot. at 26. Defendants counter that a preliminary injunction would "significantly delay" N.Y.C. Groceries, threaten its long-term viability, and prevent Defendants from addressing their public health and affordability prerogatives. Opp. at 27.

The Court finds the balance of equities and public interest weigh decidedly against granting an injunction. True, "'[t]he public interest in vigilant enforcement of the antitrust laws' is indisputable." *United States v. Apple Inc.*, 992 F. Supp. 2d 263, 290 (S.D.N.Y. 2014) (quoting *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955)), *aff'd*, 787 F.3d 131 (2d Cir. 2015); *see also Fed. Trade Comm'n v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 495 (S.D.N.Y. 2024) ("There is a strong public interest 'in enforcement of the antitrust laws and in the preservation of competition.'" (citation omitted)). But, as stated previously, Plaintiffs are unlikely to succeed in demonstrating a violation of the antitrust laws and any minimal chance of success on their claims

must be weighed against how N.Y.C. Groceries will address another matter of public concern: widespread issues of food access and affordability in New York City, *see* Recipe for Affordability at 4, 6; Kessler Decl. ¶ 12; Khan Decl. ¶ 7, most immediately in the Bronx where these issues are particularly pressing, *see* Press Release at 4 (observing that "77% of households" in and around Hunts Point in the Bronx "struggle to afford basic necessities"); Neer Decl. ¶ 8 (stating Bronx store is targeted to open by 2027). The Court also acknowledges that an injunction could delay the implementation and raise costs on taxpayers. *See* Neer Decl. ¶¶ 46-51. Although Plaintiffs correctly observe that Defendants are promoting food access for New Yorkers in other ways, *see* Reply at 12, the Court declines to hold that these existing programs, such as FRESH, sufficiently remedy the public policy problems N.Y.C. Groceries aims to address such that the equities and the public interest support an injunction.

Therefore, the Court concludes that the balance of equities and the public interest disfavor granting a preliminary injunction and certainly do not tip decidedly in Plaintiffs' favor. *See City of Newburgh v. Richardson*, 435 F. Supp. 1049, 1061 (S.D.N.Y. 1977) (concluding that the government's interest in "speedily" "putt[ing] unemployed persons throughout the country to work on public works projects" outweighed plaintiff's "financial distress"); *Glidedowan, LLC v. N.Y. State Dep't of Health*, 768 F. Supp. 3d 503, 525 (W.D.N.Y. 2025) ("[W]hen balancing the equities between [p]laintiff's potential pecuniary harm and the important interests articulated by [the state agency] — namely, reducing administrative costs, better oversight, and controlling fraud — the balance of the equities favors [the state agency].").

## III. Irreparable Harm

Finally, to obtain a preliminary injunction, a plaintiff must also establish irreparable harm. *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 37-38 (2d Cir. 1995). To show irreparable harm, "the moving party 'must demonstrate that absent a preliminary injunction [it]

will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'" *State Farm*, 120 F.4th at 80 (alteration in original) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). In other words, "the moving party must show that 'there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.'" *Id.* (quoting *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)).

Plaintiffs contend they face irreparable harm absent an injunction because (1) Palero Foods, a non-party member of NSA, has submitted a bid and would face antitrust liability if selected to operate a Store, and (2) other Plaintiff private grocery stores may need to "undertake plans to defer renovations, delay technology improvements, seek rent concessions, or simply cease operations" in anticipation of the N.Y.C. Groceries store in their neighborhood. Reply at 11; *see also* Mot. at 24-26.

However, Plaintiffs only speculate that Palero Foods *may* be selected to operate a Store, and even if it were likely to be selected, Defendants have agreed that applicants may withdraw their bids *before* selection should the Court grant a preliminary injunction in this matter. *See* Sep. Tr. 13:10-12. This would resolve any issues before Palero Food enters into any agreement that allegedly violates the antitrust laws. Moreover, those entering into an agreement with the City would likely be immune from civil liability, *see* 15 U.S.C. § 36(a) (providing civil antitrust immunity for "damages, interest on damages, costs or attorney's fees" in "claim[s] against a person based on any official action directed by a local government, or official or employee thereof acting in an official capacity"), and criminal exposure is extremely unlikely, *see* Areeda & Hovenkamp ¶ 726 (acknowledging there have been no criminal prosecutions for predatory pricing under the Robinson Patman Act "since the early 1960s"). In addition, the claim that

other Plaintiffs need to undertake speculative "plans" following the selection of a bidder establishes, at most, a "remote and speculative possibility of future harm rather than the imminent likelihood of injury" required to warrant the "extraordinary remedy" of a preliminary injunction. *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990).

All that said, the Court need not conclusively resolve the question of irreparable harm given that Plaintiffs have failed to meet their burden with respect to the merits of their claims for purposes of a preliminary injunction. *See Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) ("Because a likelihood of success has not been shown here, however, we need not decide whether a presumption of irreparable harm would otherwise apply. Whether presumed or not, any irreparable harm plaintiffs might suffer in this case does not warrant a preliminary injunction in the absence of a showing of (at least) a likelihood of success."); *B/E Aerospace, Inc. v. Jet Aviation St. Louis, Inc.*, No. 11-cv-4032 (BSJ), 2011 WL 2852857, at *3 (S.D.N.Y. July 1, 2011) ("In view of [plaintiff]'s failure to show a likelihood of success on the merits or sufficiently serious questions going to the merits, the Court need not address the issue of irreparable harm."); *Time Warner Cable, Inc. v. DIRECTV, Inc.*, No. 06-cv-14245 (LTS), 2007 WL 1138879, *6 (S.D.N.Y. Apr. 16, 2007) ("Because the Plaintiff has failed to establish a likelihood of success on its claims, or sufficiently serious questions going to the merits to make them a fair ground for litigation, the Court need not examine irreparable harm in this instance[.]"); *Matthews v. Shalala*, No. 93-cv-1408 (MBM), 1993 WL 385783, at *3 (S.D.N.Y. Sept. 28, 1993) ("[P]laintiff demonstrates neither a likelihood of success on the merits nor a serious question going to the merits of her claims, . . . [thus] the court need not address whether plaintiff will suffer irreparable harm"); *see also Care One, LLC v. Nat'l Lab. Rels. Bd.*, 166 F.4th 335, 349-50 (2d Cir. 2026) (Pérez, J., concurring) ("While . . . we have said irreparable harm is the most important prerequisite when considering a preliminary injunction, we have also

often first considered the merits of the claims." (citing *Walden v. Kosinski*, 153 F.4th 118, 141 (2d Cir. 2025)).

**CONCLUSION**

For all the reasons stated above, Plaintiffs have not established the requirements for a preliminary injunction and their motion is DENIED.

The Clerk of Court is respectfully directed to terminate the motion at Dkt. 28.

Dated: November 20, 2026
New York, New York

SO ORDERED.

Jennifer Rochon

JENNIFER L. ROCHON
United States District Judge